[Civ. No. 41979. Second Dist., Div. Five. May 21, 1974.]

NATIONWIDE INVESTMENT CORPORATION,
Plaintiff, Cross-defendant and Appellant, v.
CALIFORNIA FUNERAL SERVICE, INC.,
Defendant, Cross-complainant and Respondent.

## Counsel

Frazier, Dame & Doherty for Plaintiff, Cross-defendant and Appellant.

Heily, Blase, Ellison & Wellcome and Howard L. Winton for Defendant, Cross-complainant and Respondent.

## Opinion

**HASTINGS, J.** — Plaintiff and cross-defendant, Nationwide Investment Corp. (Nationwide), appeals from summary judgments granted in favor of California Funeral Service, Inc. (CFS), defendant and cross-complainant, on the complaint brought by Nationwide and on CFS's cross-complaint.

## FACTS

Initially, Nationwide instituted an action against CFS for the balance due on two installment notes dated April 11, 1972. CFS's answer admitted the execution and delivery of the notes as well as the nonpayment of the September 15, 1972 installments due on each thereof; CFS denied that the unpaid balance of the notes was due and owing, and for a first affirmative defense CFS alleged that the notes were given pursuant to terms contained in a five-year written contract[1] with Nationwide's assignor, a Robert W.

---

[1]Pertinent provisions of said contract are as follows:

". . . WHEREAS, the services offered by [Nationwide] include, among other things, locating and negotiating purchases, acquisitions and mergers; negotiating and arranging for equity and debt financing; public relations and other management consulting services, and

"WHEREAS, CFS is engaged in the business of acquiring, operating and managing funeral homes, cemetaries [sic] and other funeral service oriented businesses, and

"WHEREAS, CFS desires to employ the services of [Nationwide] on a contractual basis to exclusively represent CFS in negotiating the purchase, acquisition or merger by CFS of funeral homes, cemetaries [sic] and other funeral service businesses; negotiating and arranging for equity and debt financing and handling stock holder and broker relations. . . .

"1) CFS does hereby hire the services of [Nationwide] as a corporate financial consultant for a period of five (5) years from the date of this Agreement and [Nationwide] does hereby agree to perform such services for CFS for the said five (5) year period.

"2) [Nationwide] shall be the exclusive representative of CFS during the period of this Agreement, responsible for locating and negotiating for the purchase, acquisition or merger by CFS of funeral homes, cemetaries [sic] and other funeral service oriented businesses. In addition to the above services, [Nationwide] shall also, at the request of CFS, negotiate and arrange for equity and debt financing programs for the operations of CFS or its subsidiáries and handle the public relations program of CFS.

"3) As compensation for the services performed by [Nationwide] for CFS, the said CFS does hereby agree to pay [Nationwide] a monthly retainer fee of $1,500.00 plus a general expense allowance of $500.00 per month. The said fee shall be paid in advance on the first day of each month . . . and continuing on the first day of each and every month thereafter to the end of the period of this Agreement.

"In addition to the hereinabove described retainer and expense allowance, [Nationwide] shall also be paid a commission or finders fee equal to 9% of the gross purchase price paid by CFS for any business, including land and buildings, purchased, acquired, or merged with CFS during the term of this Agreement. . . .

"4) In consideration of the above retainer and commissions, [Nationwide] agrees to provide the full time services of no less than one employee, who, if other than ROBERT W. KUEBLER, must be acceptable to CFS, which acceptance will not be unreasonably withheld by CFS, to the exclusive business of CFS during the term of this Agreement. Among the services that such employee will perform for CFS will be the locating of and contact with the principals of businesses which CFS may wish to acquire (which principals and/or businesses are hereinafter referred to as Sellers) and to ascertain whether such Sellers are ready, willing and able to convey the assets and/or stock of such business to CFS. . . .

"6) It shall be further understood and agreed to by CFS, that the expense allow-

Kuebler (Kuebler), dba United Financial Services (United) in which United[2] agreed inter alia to negotiate the purchase, acquisition or merger by CFS of funeral homes, cemeteries, and other funeral service businesses.

CFS, as a result of United's negotiations, acquired all of the issued and outstanding shares of stock in Humphrey Chula Vista Mortuary, Inc. (Humphrey); thus, in accordance with the contract, Nationwide became entitled to a 9 percent commission of the gross purchase price paid by CFS and CFS executed the two promissory notes, the subject of the present action. However, in its affirmative defense, CFS alleged that in California, in order for any person or entity to lawfully perform these services for which the notes were given as compensation, and, in order for any person or entity to have the right to collect compensation therefor, such person or entity must be licensed by the State of California either as a real estate broker or salesman, or as a securities broker-dealer or agent. CFS's affirmative defense further alleged that neither Kuebler, individually or dba United, nor Nationwide held, at any time, such licenses.

On the same day CFS filed its answer, it also filed a cross-complaint, in three counts, seeking cancellation of the notes, attorney's fees, and a judicial declaration that the underlying Nationwide-CFS contract was void for illegality in that it required Nationwide to perform services and CFS to compensate Nationwide therefor, in violation of the California licensing statutes.

Simultaneously with the filing of its answer and cross-complaint, CFS filed motions for summary judgment on Nationwide's complaint and its cross-complaint. Later, pursuant to Nationwide's request, these motions were continued, by stipulation of counsel, for two weeks. Nationwide did not file any declaration in opposition to the motions, nor did it object at any time that the hearing of the motions would be held before an answer to the cross-complaint had to be filed; it filed a memorandum of points and authorities.

---

ance due [Nationwide] pursuant to the provision of paragraph 3 hereof shall only be for [Nationwide's] services in locating and negotiating for the acquisition of funeral homes and cemeteries [sic]. Any reasonable expenses incurred by [Nationwide] for travel or entertainment related to negotiating and arranging for equity or debt financing or other services of [Nationwide], requested by CFS, other than funeral home and cemetary [sic] acquisitions, shall be reimbursed in full to [Nationwide] by CFS. . . ."

[2]Kuebler dba United assigned the contract set forth in part in fn. 1 to Nationwide, an Arizona corporation, in which the Kuebler family owned all of the stock. The assignment of the contract was made during the negotiations to purchase the Humphrey Chula Vista Mortuary, Inc. In order to simplify the reading and understanding of this opinion, we have substituted Nationwide in the contract for United.

After hearings were held, the trial court granted both motions, and summary judgments were entered in favor of CFS on the complaint brought by Nationwide and on the cross-complaint filed by CFS.

## DISCUSSION

This case is atypical in that Nationwide seeks a commission for successfully negotiating the sale of a business to defendant although not licensed as a real estate broker or as a securities broker.[3]

Having placed itself in this position, Nationwide argues the real estate broker's license is inapplicable to this transaction because it involved the sale of all of the stock of Humphrey and therefore was a securities transaction for which it was not required to have a license. CFS, in its answer to the complaint, seems to agree it was a securities transaction by pleading in pertinent part: "As had been contemplated by all parties at the inception of the aforesaid negotiations, said purchase was consummated by means of the sale and purchase of the issued and outstanding shares of stock of HUMPHREY. . . ." CFS, however, does not concede Nationwide was exempt from the licensing requirement.

We agree with the parties that this was a securities transaction, and we determine only whether Nationwide was a broker-dealer and required to have a securities broker's license.

Nationwide argues that it was not necessary for it to be licensed as a broker-dealer in securities since the applicable California Corporations Code section (Corp. Code, § 25004)[4] "is meant to cover persons who represent issuers or owners of securities who wish to *sell* the securities to others and not meant to cover representatives of *purchasers* especially in non-issuer transactions." (Italics added.)

The present Corporate Securities Law of 1968 superseded a similarly titled law adopted in 1949. Although changes were numerous in other portions of the 1968 law, the definition of a broker-dealer in section 25004 is substantially similar to the definition of a "broker" under former sections

---

[3]See *Weber* v. *Jorgensen,* 16 Cal.App.3d 74 [93 Cal.Rptr. 668], and *Stoll* v. *Mallory,* 173 Cal.App.2d 694 [343 P.2d 970], for cases involving real estate brokers seeking commissions on security sales.

[4]Unless otherwise stated all code sections refer to the California Corporations Code.

25006 and 25006.1.[5] Nationwide contends it was not a broker-dealer within the meaning of either section, for the reasons stated above and others stated *infra*. There are no reported cases concerning a security transaction where an unlicensed individual negotiates for securities on behalf of a purchaser. We can, however, use post- and pre-1968 law relevant to this issue to give us guidance in our determination of the problem inasmuch as there was little substantive change in the applicable code sections.

ARGUMENT

1. Under section 25004,[6] a "broker-dealer" is defined as "any person engaged in the *business of effecting transactions* in securities in this state for the account of others or for his own account. . . ." (Italics added.) To be read and assimilated with the above section is new section 25210 providing that "Unless exempted under the provisions of Chapter 1 (commencing with section 25200) of this part, no broker-dealer or agent shall effect any transaction in, or induce or attempt to induce *the purchase* or sale of, *any security* in this state unless such broker-dealer or such agent has first applied for and secured from the commissioner a certificate, then in effect, authorizing such person to act in that capacity." (Italics added.)

Contrary to Nationwide's assertions, the Legislature did not restrict the licensing requirements of securities broker-dealers to only those persons who negotiate for the *sale* of securities on behalf of sellers. The language in the two sections is unambiguous, and unmistakably refers to sales and purchases. The new section 25210 gives added thrust to the meaning of section 25004. Under the 1949 law, section 25700 requiring a "broker" as defined in former section 25006 to be licensed simply provided: "No person or company shall act as an agent or broker until it has first applied

---

[5]Schutzbank & Andrews, California Corporate Securities Law Analysis (Cont. Ed.Bar 1968) page 124.

[6]Section 25004 provides: " 'Broker-dealer' means any person engaged in the business of effecting transactions in securities in this state for the account of others or for his own account. 'Broker-dealer' does not include (a) an agent, (b) an issuer, (c) a bank, trust company, or savings and loan association, (d) any person insofar as he buys or sells securities for his own account, either individually or in some fiduciary capacity, but not as a part of a regular business, (e) a person who has no place of business in this state if he effects transactions in this state exclusively with (1) the issuers of the securities involved in the transactions or (2) other broker-dealers, or (f) a broker licensed by the Real Estate Commissioner of this state when engaged in transactions in securities exempted by subdivision (f) or (p) of Section 25100 or in securities the issuance of which is subject to authorization by the Real Estate Commissioner of this state or in transactions exempted by subdivision (e) of Section 25102." (Adopted almost verbatim from Uniform Securities Act.)

for and secured from the commissioner a certificate. . . ." Section 25210 performs the same function under the 1968 law by requiring a broker-dealer to have a certificate, but the important words ". . . or induce or attempt to induce the purchase or sale of, any security . . ." are new. The cardinal rule of statutory construction is that the intention of the Legislature must be ascertained and given effect. (Code Civ. Proc., § 1859; *Van Nuis* v. *Los Angeles Soap Co.,* 36 Cal.App.3d 222, 228 [111 Cal.Rptr. 398].) ■ While an intention to change the law is indicated by a material change in the language of a statute, a consideration of the surrounding circumstances may indicate the amendment was merely the result of a legislative intent to clarify the true meaning of the statute. *(Martin* v. *California Mut. B. & L. Assn.,* 18 Cal.2d 478, 484 [116 P.2d 71].) Although the purchase of Humphrey occurred after the 1968 law, if there was any doubt concerning the scope of the 1949 law, the Legislature by adding the new words to section 25210 made its intent conspicuous that a transaction includes purchase or sale of securities.

*Owen* v. *Off,* 36 Cal.2d 751 [227 P.2d 457] materially assists us in this opinion because, as here, the plaintiff was urging an interpretation of former sections[7] of the code that was different in meaning than the patent wording. Plaintiff argued first that neither an agent nor a broker is required to be licensed to effect sales of securities "on behalf of" the owner and second that a single or isolated transaction should not be deemed subject to licensing requirements. In denying the first contention of plaintiff, the court stated in part at page 755: "Especially it is apparent that the language did not release requirements for the licensing of a person employed as a compensated agent or as a broker to sell stock for an owner. Not all sales are of original issues, but a large proportion of those conducted on the stock exchange and privately are sales of owners' stock. To apply the language as here invoked would be to place obstructions in the application of the salutary provisions of the act and defeat in large part the legislative objective in enacting requirements for the licensing of agents and brokers." To plaintiff's second argument the court opined (pp. 755-756), "It may be assumed, as insisted by the plaintiff, that he was not in the business of selling securities and that he did not act in the capacity of a broker as defined in the Corporate Securities Act. However, it is incontrovertible that he was employed by the defendants for compensation to sell their stock. The Corporate Securities Act requires the licensing of all such compensated agents. It does not admit of an exception as to a transaction by a person who has been employed for compensation

---

[7]Sections 25005, 25006, 25150-25152, and 25700.

to sell stock. . . . The plaintiff admittedly was a person employed by the defendants for compensation to sell or negotiate for the sale of the stock. He was therefore an agent as defined by the act and was required to procure a license."

In sum, the court is saying that, absent positive evidence to the contrary re the intent of the Legislature, the code sections, when clear and unambiguous, are to be interpreted accordingly.

 Applying this concept to the two sections involved, it is evident that if an individual in the course of his business participates in negotiations that involve the *purchase or sale of securities* (§ 25210), he is effecting or attempting *to effect a transaction* (§ 25004) in such securities and is a "broker-dealer." Lending substance to our analysis is the following statement found in 21 Stanford Law Review 152, 157, "The approach of the 1968 California Corporate Securities Law is to sweep *all* transactions in securities within the regulatory net . . . . The 1968 Law then specifically exempts those transactions and securities where regulation is considered unnecessary or too burdensome." No exemption, such as claimed by Nationwide, is spelled out or even inferred.

 We also believe the 1968 act was designed to prevent individuals or others from operating in certain fringe areas of security transactions without a license. This case presents a good example. Nationwide's duties under its contract with CFS were specific. Paragraph 2 states, "[Nationwide] shall be . . . responsible for . . . negotiating for the purchase, acquisition or merger . . . of funeral homes. . . ." Paragraph 3 provides that Nationwide shall be paid a commission for such services. Paragraph 3 declares "[Nationwide] agrees to provide the full time services of no less than one employee . . . to ascertain whether such Sellers are ready, willing and able to convey the assets and/or stock of such business to CFS." This wording lucidly demonstrates that Nationwide was engaged to negotiate securities transactions. We do not need to elaborate on the meaning of mergers. While there can be exceptions, the overwhelming number of mergers are stock oriented and require expertise with complicated negotiations.[8]

Placed in the record were numerous other transactions that Nationwide solicited and even negotiated, but which were not concluded. Their ac-

---

[8]As obiter we will state that, had Humphrey Chula Vista Mortuary not been a corporation but had sold all of its assets instead of stock to CFS, with Nationwide being the intermediary and negotiating the deal, Nationwide would have been required to have a real estate broker's license.

tivities, in conjunction with their duties as spelled out in the contract, indicate they claimed ability and skill to solicit and negotiate stock acquisitions and mergers. ██ Licensing statutes are to protect the public. They require of the licensee minimum standards of training, experience, miscellaneous qualifications, and appropriate examinations. When a person contracts to perform specialty services in a licensed field, generally, the burden is on him to determine if he is exempt from licensing, not on the person hiring him. The latter (CFS here) is part of the public to be protected.

██ The heart of Nationwide's argument is that the purchase and sale of the securities was an "exempt" transaction under section 25104, therefore, Nationwide is also excluded from the licensing requirement under sections 25210 et seq. In view of the fact that CFS used an unlicensed person to negotiate the sale it is debatable under said sections that the sale here was exempt.[9] In any event, the determination of this issue is immaterial to our decision because Nationwide's contention is answered in 3 Witkin, Summary of California Law (7th ed. 1960) Corporations, section 66, page 2360 which states: "The licensing provisions are so broad that they cover brokers and agents even though the securities in which they deal may be exempted from the permit provisions of the Act. (See Corp.C. 25005, 25006(a); Ballantine, p. 610; *Owen v. Off,* supra.)"

To this we add our own comment that, had there been no decisional law refuting Nationwide's contention, our ruling would be the same. It is compelled by the concise and unambiguous wording of the two code sections, and if this decision is contrary to the Legislature's intent, it is incumbent on said body to clarify the law accordingly.

2. ██ Relying upon *Orange County Air Pollution Control Dist.* v. *Superior Court,* 27 Cal.App.3d 109 [103 Cal.Rptr. 410], Nationwide contends that the trial court erred in granting the summary judgment on the cross-complaint because cross-defendant Nationwide had not then answered the cross-complaint. In holding that a summary judgment may not be rendered against a nondefaulting defendant prior to his filing an answer, the court in *Orange County Air Pollution Control Dist.* stated at pages 113-114: " '. . . a moving defendant, unlike a moving plaintiff, need merely establish a defense to claim theretofore asserted "in the action." His supporting affidavits are responsive in nature and are necessarily addressed to the complaint. . . .' [Citation]. The same is not true when

[9]See Note, *Nonissuer Transactions,* (1968) 21 Stan.L.Rev., pp. 165-168.

the plaintiff is the moving party. The function of the pleadings in a motion for summary judgment is to delimit the scope of the issues; the function of the affidavits or declarations is to disclose whether there is any triable issue of fact within the issues delimited by the pleadings. [Citations]. Since the defensive issues are not delimited until an answer is filed, the plaintiff cannot intelligently address the factual averments in his affidavits or declarations to the defensive issues, and it is, therefore, inappropriate for him to move for summary judgment prior to the filing of an answer by the defendant."

In the present case Nationwide had filed its complaint which CFS had answered; in addition thereto CFS had filed a cross-complaint. The summary judgment was granted as to the cross-complaint before Nationwide had filed its answer thereto. However, the facts and arguments applicable to the motion for summary judgment on the complaint are also applicable to the summary judgment motion on the cross-complaint. Both the action and cross-action are concerned with whether the Nationwide-CFS contract is void for illegality in that the contracted services may only be rendered by persons licensed by the State of California as either real estate brokers or security broker-dealers. Essentially, the cross-complaint merely requests an administrative act, i.e., the cancellation of the promissory notes subject of the main action and cancellation of the financial services agreement between Nationwide and CFS upon which the notes are based. The issues were clearly delimited by the pleadings on file, and the court did not err in granting CFS a summary judgment on the cross-complaint.

■ In granting the summary judgment on the cross-complaint, the trial court declared the Nationwide-CFS contract void. Nationwide contends that it was error for the trial court to cancel the financial services agreement since CFS did not demonstrate that all parts of the agreement were void or voidable, arguing that partial illegality does not make the contract totally void. It is true that under the contract Nationwide agreed to "negotiate and arrange for equity and debt financing" and to "handle the public relations program for CFS," and that these services did not require Nationwide to be licensed and were, therefore, not illegal. However, defendant's contention that the contract is severable is without merit. These "legal" services were to be performed only "at the request of CFS." Compensation of all services was, initially, a monthly retainer fee of $1,500 plus a $500 monthly expense allowance (which, under paragraph 6, was allocable only to locating and negotiating for the acquisition of funeral homes and cemeteries), and later, under possible future circum-

stances, the monthly retainer would be increased to $2,000. Under the contract, Nationwide's compensation would not be reduced by any amount if it did not render any of the legal services set forth in the contract. CFS' payments to Nationwide did not vary with the performance of any of the legal services. The contract does not provide that any of the compensation paid Nationwide would be reduced by any amount, or according to any formula, if CFS did not request Nationwide to perform any of the "legal" services.

In *Lawn* v. *Camino Heights, Inc.*, 15 Cal.App.3d 973 [93 Cal.Rptr. 621], the plaintiff contended that defendant corporation's promise to convey five residential lots was severable from its agreement to pay him in stock. The court at page 980 stated: " '[T]he rule relating to severability of partially illegal contracts is that a contract is severable if the court can, consistent with the intent of the parties, reasonably relate the illegal consideration on one side to some specified or determinable portion of the consideration on the other side. . . .' [Citation.] 'If any part . . . of several considerations for a single object, is unlawful, the entire contract is void.' [Citation.]

"Nothing in the written agreement of December 18, 1961, nor in the other evidence before the court, suggested that any *part* of plaintiff's services had been promised in exchange for the illegal promise to pay stock, or that the parties had allocated the rest of plaintiff's services as consideration for the legal promise to convey lots. [Citations]. Defendant corporation's two promises were consideration for a single object—namely, plaintiff's promise to serve as a consultant. Therefore, the promise to convey lots was not severable from the illegal promise, and cannot provide the basis for a recovery of damages under the written contract. [Citation]."

An integral part of the consideration to be paid Nationwide and undoubtedly the primary reason for the contract's existence, was its promise to negotiate for the purchases of businesses on CFS's behalf; the "legal" services cannot be severed from the "illegal" services, and there was no error in rendering the Nationwide-CFS contract totally void.

The judgments are affirmed.

Kaus, P. J., and Ashby, J., concurred.