*Supp. 16 Opinion
COOPERMAN, P. J.
On September 11, 1984, plaintiff Continental Insurance Company (hereafter Continental) filed a complaint1 in interpleader, for declaratory relief, for indemnity, and for reimbursement based on the following pertinent allegations: Plaintiff is a New Hampshire corporation authorized to conduct and conducts a general insurance and surety business in California. Defendants Richard V. Stanton, Donald E. Crockett, Larry Chambers, and Howard Mandel are California residents. Defendant J & T Trucking Company is a California Corporation. Defendant Stanton, dba Motor Truck Transport, was duly licensed as and was doing business as a trucking and hauling business pursuant to the laws of California.
On or about February 5, 1979, defendant Stanton executed and delivered to plaintiff a written application for a surety bond pursuant to which Stanton agreed to reimburse and indemnify plaintiff from any and all damages, expenses, etc., including attorney fees, that arose by reason of its suretyship obligations under the applied-for surety bond. Exhibit “1” to the complaint was a copy of the application.
On or about April 4, 1979, plaintiff, as surety, and Stanton, as principal, executed and delivered Sub-Hauler’s Bond No. 2151656 in favor of the People of the State of California in the penal sum of $10,000 and conditioned as required by sections 3575 and 1074 of the California Public Utilities Code. Exhibit “2” to the complaint was a copy of the bond. The bond was to be effective as of February 20, 1979, and to remain in effect until it was cancelled.
On or about July 12, 1979, the bond was amended to change the name of the principal under the bond from Richard V. Stanton to Richard V. Stanton, dba Motor Truck Transport. Exhibit “3” to the complaint was a copy of the bond amendment, which was effective as of June 28, 1979, until can-celled.
Plaintiff sought to interplead the penal sum of the bond, i.e., $10,000, for the reason that defendants Crockett, Chambers, Mandel, and J & T Trucking Company each had asserted claims against plaintiff on the bond for losses or damages claimed to have been suffered by them on account of Stanton’s actions during the period the bond was in effect, which claims aggregated to a sum substantially in excess of the $10,000 limit of the bond. *Supp. 17 In conjunction with the interpleader cause of action, plaintiff requested an award of attorney fees.
Plaintiff also sought a declaration concerning the duties plaintiff may owe defendants and defendants’ respective rights as to the bond. As for Stanton, plaintiff requested recovery of costs, including attorney fees, on the alternative theories of express indemnity and statutory reimbursement pursuant to Civil Code section 2847.
Crockett answered by denying that plaintiff’s liability on the bond was limited to the penal sum of $10,000 and that plaintiff was entitled to recover its costs and attorney fees.
Crockett’s cross-complaint, which is dated February 25, 1983, alleged in paragraph 6 that “[wjithin one year last past [he] performed subhaul services for [Stanton] with a total aggregate value of $10,305.31. [He] demanded that sum from [Stanton] on or about June 1, 1982, but [Stanton] has failed and refused to pay [Crockett] anything but the sum of $600 in cash and property worth $900, leaving due and owing the sum of $8,805.31.” Crockett sought recovery of $8,805.31 plus interest from Stanton and plaintiff for the performed but unpaid subhaul services and for a declaration that Crockett was entitled to receive the full value of that claim against the bond. It was alleged in pertinent part that plaintiff/cross-defendant Continental was a surety on a bond issued pursuant to California Public Utilities Code sections 1074 and 3575 in the amount of $15,000 for the benefit of subhaulers engaged by Stanton, dba Motor Truck Transport.
Continental answered the cross-complaint by generally denying the material allegations. By way of affirmative defenses, it asserted that the cross-complaint failed to state a cause of action against it and that the bond in question was limited on its face to the penal sum of $10,000, which sum could not be increased or altered since to do so would violate the contracts clause of article I, section 9, of the California Constitution.[2]
The settled statement reflects the following transpired at trial;
Present at trial were James Trachy, attorney for plaintiff and cross-defendant Continental Insurance Co.; R. Stevens Condie, attorney for inter-pleader defendant and cross-complainant Donald Crockett; Donald Crockett; Gerald Gress, attorney for interpleader defendant Larry Chambers; and interpleader defendant Howard Mandel, dba Mobile Body & Paint, in propria persona. There was no appearance by defendant Richard V. Stanton.
*Supp. 18 No testimony was received.
Condie advised the court of the issues and positions of the parties as follows:
Plaintiff and cross-defendant Continental Insurance Company had submitted the sum of $10,000 to be divided by interpleader among the four “sub-haul” truckdrivers who had not been paid for their work by cross-defendant Stanton and who were the interpleader defendants in the case. The indebtedness of Stanton to the four truck drivers exceeded $50,000.
Crockett brought a cross-complaint alleging that the bond obligation of Continental Insurance Company is not $10,000 but $15,000. No other party joined in the cross-complaint.
In the event Crockett prevailed, he asserted a right to enjoy sole payment from the additional $5,000, which would reduce the value of his claim on the rest of the bond.
Condie then advised the court of the following stipulations:
All parties agreed that defendant J & T Trucking should receive $800 from the bond, in satisfaction of its claim thereon.
Of the remaining truckers, the following amounts were stipulated as the full value of each party’s claim:
1. Chambers: $47,000.00
2. Crockett: $ 8,000.00
3. Mandel (Mobile Body & Paint): $ 2,535.05
In the event that Crockett’s claim for $5,000 was denied, the proportionate interests of the remaining three truckers would be:
1. Chambers: .806
2. Crockett: .151
3. Mandel: .043
On the other hand, if Crockett’s claim for $5,000 was upheld the proportionate interests of the remaining three truckers would be:
*Supp. 19 1. Chambers:
.881
2. Crockett:
.071 (in addition to the $5,000)
3. Mandel:
.048
After Trachy and Condie briefly argued their respective legal positions concerning the merits of the cross-complaint, they agreed to submit the matter on their trial briefs and the evidence supplied by Continental’s Evidence Code section 1511 notice and Code of Civil Procedure section 98 notice.[3] Trachy also argued briefly in support of Continental’s request for attorney fees payable from the interpleaded amount of the bond pursuant to Code of Civil Procedure section 386.6.
All parties present agreed to submit the matter.
The court’s minutes reflect that the trial took place on May 16, 1984, and that after the matter was submitted, the trial court on the same day rendered judgment for the interpleader defendants on the complaint. It ordered plaintiff to pay $10,000 less $1,000 attorney fees and costs and declared that after such payment plaintiff would be discharged from further liability to defendants and cross-complainant. Specifically, the judgment, as entered, reveals that J & T Trucking Company was awarded the sum of $800, Crockett the sum of $582.20, Chambers the sum of $7,224.20, and Mandel the sum of $393.20. Plaintiff/cross-defendant Continental prevailed against Crockett on the latter’s cross-complaint but was given no award for costs or attorney fees in that regard.
On appeal from the judgment Crockett complains that the court erred in limiting his recovery on the complaint to the sum of $582.20 and in failing to award him any relief on his cross-complaint. Essentially, his position is three-pronged: (1) the amount of the bond is $15,000, not $10,000; (2) it was error to award $1,000 in costs and attorney fees to Continental from the amount of the bond; and (3) the court made an arithmetical error in computing the respective amounts of the judgment in favor of each defendant, except J & T Trucking.
*Supp. 20 We find no merit to Crockett’s first and second claims. We agree, however, that the judgment in favor of each defendant, except J & T Trucking, does in fact reflect arithmetical errors. We therefore affirm the judgment as modified to reflect the correct amounts.
I.[4] Surety’s Aggregate Liability on the Bond
Crockett concedes that the face amount of the bond in question is $10,000. Nonetheless, he asserts that the actual amount of the bond is in fact $15,000. The keystone of his position is his assertion that $15,000 was the amount of bond required under Public Utilities Code sections 1074 and 3375 and Public Utilities Commission General Order [G.O.] No. 102-H at the time the claims in question arose.
Pointing to the fact that the bond agreement here expressly states that the amount of the bond “has been determined by the Commission in its General Order No. 102 series to secure the payment of the claim of subhaulers, [etc.] (emph. added)” and to the fact that the bond has no expiration date, Crockett contends that the significance of those facts is to render the amount of the bond at issue flexible, i.e., to be determined by the amount of bond required by the G.O. No. 102 in effect at the time the claim or claims arose.
Based on that reasoning Crockett urges us to disregard the face amount of the bond, i.e., $10,000, since that figure was the amount required by the former G.O. No. 102-F,[5] which was in effect in 1979 when the bond was originally procured, and to adopt the $15,000 figure, which reflects the bond amount required by G.O. No. 102-H, which was in effect at the time the subject claims arose and is presently in effect.
Alternatively, Crockett contends that the bond in question is uncertain concerning the actual amount involved, i.e., there is a conflict between the face amount of the bond and the condition that the bond is subject to the amount specified in the G.O. 102 series, and, thus, the amount should be interpreted to give effect to the intent of the parties contracting the bond. (Civ. Code, §§ 1641, 1650, 1643, 1649.) He asserts that since “[t]he intent of the bond is stated unequivocally in its heading: it is to secure payments to subhaulers pursuant to the G.O. 102 seriesthe parties evidenced “a *Supp. 21 clear intent to secure obligations which will change over time.” Accordingly, when the $10,000 limit in former G.O. No. 102-F was increased to $15,000 pursuant to the superseding G.O. No. 102-H, the amount of the bond here must also be construed to have increased to that latter amount in order to effectuate the parties’ intent.
Crockett cites as authority City of Torrance v. Workers’ Comp. Appeals Bd. (1982) 32 Cal.3d 371 [185 Cal.Rptr. 645, 650 P.2d 1162], which holds that laws enacted subsequent to the execution of an agreement are deemed to become part of the agreement where the evidence establishes this to have been the parties’ intent (id., at p. 379), for his conclusion that the amount of the bond must be based on the G.O. No. 102 in effect at the time the claim arose.
As another compelling reason, Crockett argues that the increase in the amount of a bond applies automatically, in any event, since the Public Utilities Commission’s system for adopting general orders permits a surety ample opportunity to cancel a bond prior to an increase in coverage taking effect, and thus, a surety’s failure to cancel must be construed as consent to the new liability limitation.
By way of exemplary support, Crockett asserts: “As can be seen from the terms of G.O. 102-G and G.O. 102-H, a surety company is always given an opportunity to cancel its bond[s] prior to the effective date of a new order. In the case of G.O. 102-H almost three months elapsed between adoption and issuance. Thus, any surety that wishes not to be subject to the obligations of the new G.O. is not placed in a position of doing so involuntarily. Since the bonds are perpetual until cancelled, this is the only practical way to change the terms or amounts of the bonds as the P.U.C. [Public Utilities Commission] is required to do by Public Utilities Code sections 1074 and 3575.”
As a final argument, Crockett contends that Continental, the surety, is estopped from denying that the bond here is in compliance with the law, i.e., that the amount of the bond is $15,000. In other words, if the bond amount here were considered to be $10,000, then the bond would be “illegal” since it would not be legally adequate.
Crockett asserts that he reasonably relied on the bond as being sufficient in amount to cover any claims he might have against Stanton up to the legal limit required for the bond while Continental, which has a duty to ensure that its bonds are legal, could have protected itself by asking Stanton for an additional premium amount if it considered it necessary.
*Supp. 22 In this regard, he claims that Continental accepted premium payments for the bond through its cancellation date of September 14, 1982, that the work Crockett performed for Stanton took place a year after the new bond limit took effect but before the bond was cancelled, and that he relied on a legal bond being in force at the time the work was performed. From these factors Crockett concludes that Continental, not he, should bear the loss if in fact Stanton should have applied for an increase in bond amount but failed to do so.
In support, Crockett recites the maxims that it is presumed the law has been obeyed (Civ. Code, § 3548) and that between one of two innocent persons who must suffer by the act of a third, he, by whose negligence it happened, must be the sufferer (Civ. Code, § 3543).
We reject Crockett’s multi-faceted position for the reasons that it is based on a misinterpretation of the bond agreement between Stanton and Continental and is contrary to law.[6]
A. The Bond
The bond agreement expressly specifies $10,000 as the face value of the amount of the bond. The agreement further provides: “The Surety’s obligation under this bond shall not be discharged by any payment or succession of payments on claims hereunder unless and until such payment or payments shall amount in the aggregate to the penalty of this bond; provided, however, that the aggregate liability of the Surety for all such claims shall, in no event, exceed the sum of $10,000.” From the foregoing it would appear that the surety’s aggregate liability on the bond is limited to $10,000, which is the face value of the bond.
However, elsewhere in the agreement the following language appears: “The condition of this bond is such that:
“Whereas, Sections 3575 and 1074 of the Public Utilities Code require the filing of a bond in such circumstances, the amounts of which has been determined by the Commission in its General Order No. 102 series to secure the payment of the claims of subhaulers, sub-subhaulers and lessor-employees of such highway carrier. . . .
*Supp. 23 “This bond effective from the 20th day of February, 1979, A.M., Pacific Standard Time, at the address of the Principal, as stated herein, shall be continuous and remain in full force and effect until cancelled as hereinafter provided.
“The Surety may cancel this bond, only by written notice to the Public Utilities Commission of the State of California at its office in San Francisco, California, such cancellation only to become effective thirty (30) days after receipt of said notice by the Commission.”
We disagree that the language quoted immediately above must be interpreted to render the face value of the bond variable, i.e., subject to the amount of bond required by the G.O. No. 102 in effect at the time the claim arose.
Crockett’s reliance on the City of Torrance, supra, 32 Cal.3d 371 case is patently misplaced. In that case the court concluded that the parties expressly intended to incorporate subsequent statutory changes into the terms of their private contract based on the following evidence: “First, the language of the agreements . . . clearly indicates that it was the intention of all the parties to incorporate subsequent changes in the law. . . . Moreover, at oral argument in this case, the City agreed that it was the parties’ intention to incorporate subsequent changes in the law in their insurance agreements. ” {City of Torrance v. Workers’ Comp. Appeals Bd.., supra, 32 Cal.3d 371, 379.)
The City of Torrance court expressly distinguished the matter before it from the fact situation facing the court in Swenson v. File (1970) 3 Cal.3d 389 [90 Cal.Rptr. 580, 475 P.2d 852], {Ibid.)
In Swenson the court announced the general rule that “[Ljaws enacted subsequent to the execution of an agreement are not ordinarily deemed to become part of the agreement unless its language clearly indicates this to have been the intention of the parties. [Citations.]” {Swenson, supra, at p. 393.) The Swenson court found no evidence of such intent in the matter before it. {Id., at pp. 394-395.)
Similarly, in the present case, there is no evidence that the parties to the bond agreement at issue intended the amount of the bond to be determined by subsequent changes in the law. The record does not reflect that any extrinsic evidence was presented concerning the parties’ intent. Moreover, the language of the agreement itself does not give rise to an inference that the parties intended that the amount of the bond fluctuate depending on the amount specified by superseding regulations in the G.O. No. 102 series. (Cf. City of Torrance, supra, 32 Cal.3d at pp. 378-379.)
*Supp. 24 To the contrary, it is manifestly clear that the bond’s reference to “the General Order No. 102 series” is merely to identify and point out the source for the $10,000 figure as the amount of the bond.[7]
Accordingly, since neither the bond itself nor the parties evidenced an intent to incorporate subsequent changes in the law, the amount of the bond at issue, as a contractual matter, must be determined by reference to the provisions of the general order in the G.O. No. 102 series in effect at the time the bond was executed, i.e., No. 102-F, which set the amount of the bond required in the sum of $10,000. {Brown v. Lattimore (1860) 17 Cal. 93, 96; see also, Treweek v. Howard (1895) 105 Cal. 434, 437 [39 P. 20].)
B. The G.O. No. 102 Series
Independent of his contract contentions, Crockett asserts, alternatively, that the nature of the commission’s system for adopting general orders renders it necessary for the amount of the bond to be increased automatically in order to reflect the increase in the amount of the bond required pursuant to subsequent general orders.
The thrust of his argument is that since a surety has ample time to cancel the bond prior to the effective date of a new general order, due to a time gap between the date of its adoption and the date it goes into effect, the surety’s failure to cancel a bond prior to the effective date of the increase must be construed to signify the surety’s consent to the new liability limitation. He reasons that “this is the only practical way to change the terms or amounts of the bonds as the [commission] is required to do by Public Utilities Code §§ 1074 and 3575.”
We disagree.
Crockett’s position in this regard is based on a misapprehension of the statutory scheme for regulating bonds governed by the Public Utilities Code and the companion provisions in the Code of Civil Procedure, the nature of the regulations promulgated by the commission, and the scope of the commission’s power.
1. The Statutory Scheme
From our review of the legislative history of the pertinent statutory provisions, we conclude that it has always been and continues to be the Leg *Supp. 25 islature’s intent to limit a surety’s aggregate liability on the bond to the face amount of the bond. (Code Civ. Proc., § 996.470, subd. (a); cf. Code Civ. Proc., § 996.475.)
In 1979, the year the subject bond was issued, Public Utilities Code sections 1074 and 3575, respectively, read: “Every highway common carrier, cement carrier and every petroleum irregular route carrier who engages subhaulers or leases equipment from employees shall file with the commission a bond, the amount of which shall be determined by the commission but which shall be not less than two thousand dollars ($2,000), executed by a qualified surety insurer, subject to the approval of the commission, which bond shall secure the payment of the claims of subhaulers and employee-lessors of the highway common carrier, cement carrier or petroleum irregular route carrier. The aggregate liability of the surety for all such claims shall, in no event, exceed the sum of such bond.” (Italics added.)
“Every highway contract carrier, dump truck carrier, livestock carrier, cement contract carrier and every radial highway common carrier who engages subhaulers or leases equipment from employees shall file with the commission a bond, the amount of which shall be determined by the commission but which shall be not less than two thousand dollars ($2,000), executed by a qualified surety insurer, subject to the approval of the commission, which bond shall secure the payment of the claims of subhaulers and employee-lessors of the highway carrier, provided, however, that the aggregate liability of the surety for all such claims shall, in no event, exceed the sum of such bond.” (Italics added.)
In 1982, those sections were amended by deleting the italicized language of sections 1074 and 3575 quoted above.[8] (Stats. 1982, ch. 517, §§ 353, 354, p. 2413.)
*Supp. 26 The subsequent deletion of the language “the aggregate liability of the surety for all such claims shall, in no event, exceed the sum of such bond” from former sections 1074 and 3575 by the Legislature in 1982 presents an issue as to the Legislature’s intent. By this deletion, did the Legislature intend a substantive change in the aggregate liability of the surety, i.e., to eliminate the face amount of the bond as the limitation on the surety’s liability, or did the Legislature simply intend to clarify the law?
“The cardinal rule of statutory construction is that the intention of the Legislature must be ascertained and given effect. [Citations.]” (Van Nuis v. Los Angeles Soap Co. (1973) 36 Cal.App.3d 222, 228 [111 Cal.Rptr. 398]; T.M. Cobb Co. v. Superior Court (1984) 36 Cal.3d 273, 277 [204 Cal.Rptr. 143, 682 P.2d 338]; Select Base Materials v. Board of Equal. (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) “Moreover, ‘every statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect.’ (Stafford v. Los Angeles etc. Retirement Board [(1954)] 42 Cal.2d 795, 799 [270 P.2d 12].)” (Select Base Materials, supra, at p. 645.)
“When, as here, there is no direct evidence of the legislative intent, the court turns first to the words of the enactment for the answer and may also rely upon extrinsic aids. [Citations.]” (Neeley v. Board of Retirement (1974) 36 Cal.App.3d 815, 819 [111 Cal.Rptr. 841].) Additionally, any ambiguity with regard to legislative intent may be clarified by comparing the language used with that employed in other laws on the same subject. (Bagg v. Wickizer (1935) 9 Cal.App„2d 753, 757 [50 P.2d 1047].)
Nothing in the language of sections 1074 and 3575, as amended in 1982, sheds any light on the issue. We must therefore look elsewhere for enlight-
“As a general rule, an intention to change the law or the meaning of a statute will be inferred or presumed from a material change in the statutory language, such as where the legislature undertakes to amend ex *Supp. 27 isting law by deleting an express provision of the previous statute . . . .” (58 Cal.Jur.3d, Statutes § 50, pp. 384-385 (fns. omitted); see, e.g., Clements v. T.R. Bechtel Co. (1954) 43 Cal.2d 227, 231 [273 P.2d 5]; Wallace v. Department of Motor Vehicles (1970) 12 Cal.App.3d 356, 361 [90 Cal.Rptr. 657]; Jordan v. Consolidated Mut. Ins. Co. (1976) 59 Cal.App.3d 26, 48 [130 Cal.Rptr. 446]; cf. Koenig v. Johnson (1945) 71 Cal.App.2d 739, 753 [163 P.2d 746] [change may simply indicate a legislative intent to clarify the meaning of the statute]; accord, Nationwide Investment Corp. v. California Funeral Service, Inc. (1974) 40 Cal.App.3d 494, 501 [114 Cal.Rptr. 77].)
In determining whether to apply the above general rule or an exception here we examine the “surrounding circumstances ... in order to determine the intent with which the change was made.” (Koenig, supra, 71 Cal.App.2d 739, at p. 753.)
It is established that “[r]eports of commissions which have proposed statutes that are subsequently adopted are entitled to substantial weight in construing the statutes. [Citations.] This is particularly true where the statute proposed by the commission is adopted by the Legislature without any change whatsoever and where the commission’s comment is brief, because in such a situation there is ordinarily strong reason to believe that the legislators’ votes were based in large measure upon the explanation of the commission proposing the bill.” (Van Arsdale v. Hollinger. (1968) 68 Cal.2d 245, 249-250 [66 Cal.Rptr. 20, 437 P.2d 508]; accord, Keeler v. Superior Court (1970) 2 Cal.3d 619, 630 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420]; see also, Arellano v. Moreno (1973) 33 Cal.App.3d 877, 884 [109 Cal.Rptr. 421].) Moreover, “[s]uch [Law Revision Commission] comments are well accepted sources from which to ascertain legislative intent.” (Davis v. Cordova Recreation & Park Dist. (1972) 24 Cal.App.3d 789, 796 [101 Cal.Rptr. 358].)
In late 1981 the California Law Revision Commission issued d recommendation to the Legislature that the procedural provisions governing statutory bonds and undertakings be compiled in one place in the Code of Civil Procedure and that duplicative provisions from other codes be repealed. (16 Cal. Law Revision Com. Rep. (1982) p. 501, 503, 507-508.)
After noting that the various codes contained more than 500 different bonds and undertakings, the commission urged that this “proliferation of procedural statutes to govern bonds and undertakings is unnecessary. The rules applicable to such matters as the . . . giving of a new or additional bond or undertaking if the original bond or undertaking becomes insuffi *Supp. 28 cient, [and] the limitation on liability of a surety to the amount of the bond or undertaking . . . are the same for all bonds and undertakings. Repetition of such procedural rules in every statute that provides for a bond or undertaking is not only wasteful and adds to the complexity and length of the statutes, but also creates the likelihood of inconsistent wording and interpretation where the rules should be the same.” {Id., at p. 507.)
Specifically, the commission recommended, respectively, the following amendments, to Public Utilities Code sections 1074 and 3575:
“Public Utilities Code § 1074 (amended) Comment. Section 1074 is amended to delete a provision duplicated in the Bond and Undertaking Law. See Code Civ. Proc. § 996.470 (limitation on liability of surety). . . .
“Public Utilities Code § 3575 (amended) Comment. Section 3575 is amended to delete a provision duplicated in the Bond and Undertaking Law. See Code Civ. Proc., § 996.470 (limitation on liability of surety). . . .” {Id., at pp. 611, 612.)
In response to the commission’s recommendations the Legislature enacted the Bond and Undertaking Law.[9] (Stats. 1982, ch. 998), including Code of Civil Procedure section 996.470, subdivision (a), which reads: “Notwithstanding any other statute, the aggregate liability of a surety to all persons for all breáches of the condition of a bond is limited to the amount of the bond. Except as otherwise provided by statute, the liability of the principal is not limited to the amount of the bond.” (Stats. 1982, ch. 998, p. 3677.)
The Legislature also implemented the commission’s recommendation that the previously quoted and italicized language of sections 1074 and 3575 be deleted as duplicative of newly enacted Code of Civil Procedure section 996.470, subdivision (a).[10]
*Supp. 29 We conclude that the plain language of sections 1074 and 3575 of the Public Utilities Code prior to the 1982 amendments clearly reflected the Legislature’s intent to limit the surety’s liability on a bond to the face amount of the bond. (See, e.g., Wallace v. Department of Motor Vehicles, supra, 12 Cal.App.3d 356, 360.)
We further conclude, based on our review of the circumstances surrounding the 1982 amendments and enactment of the Bonding and Undertaking Law, that the Legislature did not intend any substantive changes by the deletion of the language “the aggregate liability of the surety for all such claims shall, in no event, exceed the sum of such bond” from sections 1074 and 3575. Instead, the unequivocal purpose underlying such deletion was simply housekeeping, i.e., to clarify and streamline the law and to abolish redundancies.
2. The Nature of the G.O. No. 102 Series
In its amicus curiae brief the Public Utilities Commission espouses the position that a surety’s aggregate liability on a bond required pursuant to the Public Utilities Code is limited to the face amount of the bond. The commission perceives this to be the Legislature’s intent underlying Public Utilities Code sections 1074 and 3575, both before and after the 1982 amendments.
In promulgating its regulations pursuant to those sections the commission’s function is to implement and carry out the Legislature’s intent. (See, e.g., Mooney v. Pickett (1971) 4 Cal.3d 669, 679 [94 Cal.Rptr. 279, 483 P.2d 1231].) In order to be valid, such regulations must be within the authority conferred on the commission. (Cal. Drive-in Restaurant Assn. v. Clark (1943) 22 Cal.2d 287, 302-303 [140 P.2d 657, 147 A.L.R. 1028].) As a creature of statute, the commission is without jurisdiction to “abridge or enlarge its authority or exceed the powers given to it by the statute, the source of its power. [Citations.]” (Ibid..)
It is well settled that “courts respect the interpretation given a statute by the agency charged with its administration and when the construction of an administrative regulation is in issue, the administrative construction is accorded even greater deference. (Citations.)” (Westfall v. Swoap (1976) 58 Cal.App.3d 109, 114 [129 Cal.Rptr. 750]; see also, Nipper v. California Auto. Assigned Risk Plan (1977) 19 Cal.3d 35, 45 [136 Cal.Rptr. 854, 560 P.2d 743]; Nelson v. Dean (1946) 27 Cal.2d 873, 880-881 [168 P.2d 16, 168 A.L.R. 467].)
Mindful of the foregoing principles, we now address the scope of the commission’s powers under Public Utilities Code sections 1074 and *Supp. 30 3575, the commission’s relationship with prime carriers and sureties in that context, and the nature and purpose of the G.O. No. 102 series.
The commission takes the position that it regulates prime carriers, that it has no authority over sureties, and that an increase in the bond amount required under a general order in the G.O. No. 102 series is the sole responsibility of the prime carriers.
According to the commission in its brief, “an understanding of the Commission’s regulatory jurisdiction under the Public Utilities Code shows why the Commission would not logically require sureties rather than prime carriers, the principals, to demonstrate compliance with a new bonding requirement.
“The Public Utilities Code charges the Commission with regulating the business of for-hire transportation over the highways of this state. The providers of such transportation are either common carriers (see [Pub. Util. Code] §§ 1061-1074) or various types of more specialized carriers collectively labelled ‘related businesses’ in Division 2 of the code. The Commission may for good cause suspend or revoke the operating authority of either type of carrier. (See, e.g., [Pub. Util. Code §§] 1070, 3771-3775.) The Commission has no such power as to sureties.
“There is little reason for the Commission to inject itself in the relationship between principal and surety in order to impose requirements directly on the surety. [Instead,] ... the regulation of sureties’ conduct [should be left] to that governmental office (i.e., the Insurance Commissioner) to which that task is statutorily delegated. ...” (The Public Utilities Commission’s Amicus Curiae Brief [A.C.B.], filed July 30, 1985, at pp. 8-9 [fns. omitted].)
The commission points out that the pre-1982 section 3575 contained an initial proviso clause empowering the commission to determine the minimum amount of security to be required of the prime carrier and that this clause was distinct from and independent of the second proviso clause, which expressly limited the aggregate liability of the surety to the amount of the bond. The commission concludes that the Legislature’s intent in this regard was to make it clear that the commission had no authority to regulate a surety’s liability on the bond; instead, its authority concerning the amount of the bond only extended to the prime carrier.
As reinforcement for these conclusions, the commission refers to the 1982 amendments to sections 1074 and 3575 and to the Bonding and Undertaking *Supp. 31 Law. Specifically, the commission relies on Code of Civil Procedure section 996.470, subdivision (a), which contains the proviso clause limiting a surety’s liability to the amount of the bond deleted from the pre-1982 sections 1074 and 3575 as well as a new sentence reflecting that the liability of the principal (prime carrier) is not limited to the amount of the bond.
The commission asserts that the enactment of section 996.470, subdivision (a), is significant for two reasons: “First, the Legislature could easily have indicated . . . that the surety’s liability on a bond is increased over the bond’s face amount if the level of the bonding requirement is raised and the surety fails to cancel the existing bond before the effective date of such increased bonding requirement. Second, . . . [t]he Commission believes that this new sentence confirms the Commission’s view that the principal, and not the surety, bears the liability arising from the principal’s failure to comply with an increased bonding requirement.
“The Bonding and Undertaking Law also contains a provision that, although it has no analogue in the Public Utilities Code, essentially codifies the Commission’s practice in administering the General Order 102 series. The provision [states]: ‘The principal shall give a new, additional, or supplemental bond if the court or officer orders that a new, additional, or supplemental bond be given.’ (Code Civ. Proc., § 996.210 [subdivision] (a).)[11] Under the clear terms of the law, the principal—not the surety—has the burden of maintaining a bond that expressly meets all current requirements. This was and is the Commission’s intention in the General Order 102 series. This was also the understanding of Commission staff, as manifest from the notice of adoption of General Order 102-H sent by staff to the affected highway carriers.[12]
“In short, the Bond and Undertaking law confirms this Commission’s contemporaneous understanding in adopting General Order 102-H that a *Supp. 32 surety’s liability on a subhaul bond is limited to the face amount of the bond.” (A.C.B., supra, at pp. 6-8.)
Specifically, the Commission rejected Crockett’s assertion that to limit the amount of the bond to its face value “creates an illegality” and conflicts with the bond’s purpose “to secure payments of sums pursuant to the G.O. 102 series. ...” {Id., at p. 10.)
“In the Commission’s view, if a prime carrier fails to file a new, additional, or supplemental bond to satisfy an increased bonding requirement, then the prime carrier is violating that requirement. It does not follow that the existing bond is illegal or in conflict with the new general order, or that the surety on the existing bond is violating the order. For all the surety knows, the prime carrier may have met the increased bonding requirement through an additional bond issued by another surety. The Commission is not aware of, nor does [Crockett] cite, any general rule of law requiring a surety to assume all of a principal’s liability under a statutory bond, or requiring the principal to secure through a single surety all possible claims. (Cf. section 7.b. of General Order 102-H, providing that a bond may—but does not have to—cover more than one operative authority held by the same carrier.) In short, the bond in this case was valid and continued to secure claims up to its face amount, even though that amount was less than the bonding requirement of General Order 102-H.” (A.C.B., supra, at pp. 10-11.)
The commission further asserts that, as a matter of policy, its interpretation of the G.O. No. 102 series affords subhaulers, such as Crockett, better protection* in the long run, against prime carriers, such as Stanton.
“As noted earlier, the Commission by virtue of its statutory role has considerably more leverage against prime carriers than against sureties. From an enforcement standpoint, it makes little sense to place the burden of reacting in the first instance to regulatory changes upon some entity other than the regulatee.
“Furthermore, under the Commission’s interpretation, a bond means what it says. Consequently, where a bond has become inadequate because of changes in the General Order 102 series, that inadequacy would be readily apparent to Commission staff reviewing the file. Staff then requires the prime carrier to get a new bond, or at least a rider to the existing bond. Under [Crockett’s] interpretation, staff would have to assume that every bond not cancelled, regardless of its terms, was consistent with the current version of General Order 102. Theoretically, this might shift some risk from subhaulers to sureties, but sureties could achieve the opposite result by *Supp. 33 cancelling all subhaul bonds automatically every time the Commission increases the bonding requirement. A gap in liability protection would result for the period following such cancellation, until a new premium had been negotiated and the bond reissued or a new bond given. Avoiding this sort of gap is important for both prime carriers and subhaulers.
“In summation, the Commission’s practice, consistent with its views of the General Order 102 series and the underlying statutory provisions, is to require the giving of a new bond, or express modification of an existing bond, where necessitated by adoption of a new version of General Order 102.” (A.C.B., supra, at pp. 12-13.)
We adopt the commission’s interpretation of the purpose, implementation, and effect of the G.O. No. 102 series as well-reasoned and as a correct reflection of the law.
C. Estoppel
Finally, we reject Crockett’s estoppel argument on the ground that it is based on the erroneous premises that the bond at issue is “illegal” and that Continental, as surety, was negligent in failing to procure additional coverage on the bond to the tune of $5,000. In point of fact, it was Stanton, as the prime carrier and principal, who was negligent in this regard since the duty to ensure that the bond was legally sufficient rested with it, not with the surety.
II-III*
The judgment is modified to reflect the award in favor of defendants Crockett, Chambers, and Mandel, respectively, to be the amounts of $1,238.29, $6,609, and $352.60 and is affirmed as modified.
Reese, J., and Shabo, J., concurred.

Our analysis, post, at pages Supp. 24-Supp. 33 concerning the proper amount of the bond as a matter of statutory interpretation obviates the need to address this point.

In his trial brief Crockett asserted that his claim arose after the required $15,000 bond amount became effective. In its trial brief Continental conceded this to be an established fact since it took the position that there were no triable issues of fact, merely a legal issue, i.e., was the bond amount $10,000 or $15,000.
Pursuant to the notices, the court had before it the bond itself, including the amendment, the notice of cancellation, effective September 14, 1982, and G.O. Nos. 102-F, effective July 1, 1974, 102-G, effective November 7, 1980, and 102-H, effective August 7, 1981.

No discussion is required here with regard to parts II and III, which address Crockett’s remaining contentions that do not merit publication. (Cal. Rules of Court, rule 976.1.)

Although G.O. No. 102-G became effective on November 7, 1980, which was a date after the bond here was procured, no changes in the required bond amount was effectuated until No. 102-H became effective on August 31, 1981, at which time the bond amount was increased to $15,000.

Continental did not contest Crockett’s assertion that his claims arose after the new bond limit became effective. Instead, its position, both at trial and on appeal, is that Crockett’s legal arguments are erroneous as a matter of law.

In its amicus curiae brief, the Public Utilities Commission “interprets the bond’s reference to the General Order 102 series as intended to avoid the necessity of reissuing every bond each time changes to the general order become effective, even where the changes do not affect the bond.” We agree that this is a possible alternative construction of that language.

In 1980, sections 1074 and 3575, respectively, were amended and read: “Every common carrier subject to Section 1061 who engages subhaulers or leases equipment from employees shall file with the commission a bond, the amount of which shall be determined by the commission but which shall be not less than two thousand dollars ($2,000), executed by a qualified surety insurer, subject to the approval of the commission, which bond shall secure the payment of the claims of subhaulers and employee-lessors of the common carrier. The aggregate liability of the surety for all such claims shall, in no event, exceed the sum of such bond.”
“Every highway carrier who engages subhaulers or leases equipment from employees shall file with the commission a bond, the amount of which shall be determined by the commission but which shall be not less than two thousand dollars ($2,000), executed by a qualified surety insurer, subject to the approval of the commission, which bond shall secure the payment of the claims of subhaulers and employee-lessors of the highway carrier; provided, however, that the aggregate liability of the surety for all such claims shall, in no event, exceed the sum of such bond.” (Stats. 1980, ch. 1096, §§ 11, 22, pp. 3516, 3517.)
However, it was not until 1982 that the subject language was deleted. As amended in *Supp. 26 1982 and presently, those sections, respectively, read: “Every common carrier subject to Section 1061 who engages subhaulers or leases equipment from employees shall file with the commission a bond, the amount of which shall be determined by the commission but which shall be not less than two thousand dollars ($2,000), executed by an admitted surety insurer, subject to the approval of the commission, which bond shall secure the payment of the claims of subhaulers and employee-lessors of the common carrier.”
“Every highway carrier who engages subhaulers or leases equipment from employees shall file with the commission a bond, the amount of which shall be determined by the commission but which shall be not less than two thousand dollars ($2,000), executed by an admitted surety insurer, subject to the approval of the commission, which bond shall secure the payment of the claims of subhaulers and employee-lessors of the highway carrier.” (Stats. 1982, ch. 517, §§ 353, 354, p. 2413.)

The law is codified at chapter 2 of title 14 of part 2 of the Code of Civil Procedure, commencing with section 995.010.

Additionally, in 1984 the Legislature added section 996.475 to the Code of Civil Procedure. (Stats. 1984, ch. 538, § 33.3.) That section provides: “Nothing in this chapter is intended to limit the liability of a surety pursuant to any other statute. This section is declaratory of, and not a change in, existing law.”
The Law Revision Commission Comment (Assembly) regarding section 996.475 clarifies the purpose of that section in conjunction with section 996.470. In pertinent part that Comment reads:
“Section 996.475 is added to make clear that the provisions of this chapter relating to the liability of á surety are not intended, either expressly or by implication, to repeal any other applicable statutes relating to the liability of a surety. Thus, for example, the provision in Section 996.470, that the aggregate liability of a surety for all breaches of the condition of a bond is limited to the amount of the bond, is intended only to limit the liability of a surety [on the bond] as security for the obligation imposed by the statute pursuant to which the bond is given. It is not intended to immunize the surety from independent statutory liability for willful failure to satisfy the obligation of a bond after the duty to pay has been established. See, e.g., section 996.480 (voluntary payment by surety). . . .” (Cal. Law Revision Com. Ann. Rep. (Mar. 1985) com. pp. 102-103; 84 Assem. J. 17814.)

11The term “officer” in that section includes the Commission. (Code Civ. Proc., § 995.160.)

12“On June 12, 1981, the following notice, signed by the director of the Commission’s Transportation Division, was mailed to 2,242 prime carriers:
“‘To: Highway Carriers Who Have Filed Surety Bonds Pursuant To General Order No. 102-Series
‘“By Decision No. 93146 dated June 2, 1981, the Commission replaced General Order No. 102-G with General Order 102-H. A copy of the Commissions [j/c] decision on this matter will be sent to you soon. [H] Among other things, the Commission increased the minimum level of surety bond which is required as a condition of engaging subhaulers or leasing highway equipment from employees from $10,000 to $15,000. [1] The increased bond amount is scheduled to be effective on August 31, 1981. If you have not received specific authority from the Commission to file a bond for a lesser amount, you must increase the amount of the bond you have on file to not less than $15,000. [H] The employment of subhaulers or lease of highway equipment without a bond on file with the Commission in the required amount is unlawful and will subject you to penalties as provided in the Public Utilities Code.’ (Emphasis added.)”

See footnote, ante, page Supp. 12.

The complaint pleaded the first cause of action in interpleader and the second cause of action for declaratory relief against all defendants. The third cause of action for express indemnity and the fourth cause of action for statutory reimbursement were pleaded against defendant Stanton alone.