[No. D047095. Fourth Dist., Div. One. Oct. 26, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
KEVIN CHARLES COLE et al., Defendants and Appellants.

[CERTIFIED FOR PARTIAL PUBLICATION*]

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I., II., III., IV., VI., VII., and VIII.

▮▮▮▮▮▮▮▮▮▮▮▮▮

COUNSEL

Arthur Martin, under appointment by the Court of Appeal, for Defendant and Appellant Kevin Charles Cole.

Patricia Ann Scott, under appointment by the Court of Appeal, for Defendant and Appellant Frank Robles.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette and Gary W. Schons, Assistant Attorneys General, Rhonda Cartwright-Ladendorf and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**HALLER, J.**—A jury convicted one-time business partners Kevin Charles Cole and Frank Anthony Robles of various felony offenses involving the sale of securities, including highly speculative ones, to more than a dozen elderly investors who lost an aggregate of more than $1 million.

With respect to 14 of these investors,[1] Cole was found guilty of 14 counts of selling securities by means of false statements or omissions in violation of Corporations Code[2] section 25401 and 14 counts of selling a security without a broker-dealer license in violation of section 25210. Robles was found guilty of 11 counts of each of these crimes involving 11 of the investors. The jury found that each defendant committed at least two felonies involving fraud or embezzlement of more than $500,000 (Pen. Code, § 186.11, subd. (a)(2)), and that the total aggregate victim losses as to each defendant exceeded $150,000 (Pen. Code, § 12022.6, subd. (a)(2)). Cole also was found guilty of two counts of theft from an elder (Pen. Code, § 368, subd. (d)), and one count of residential burglary (Pen. Code, §§ 459, 460).[3] The trial court sentenced Cole to 17 years in state prison and Robles to 11 years eight months.[4]

---

[1] For those counts involving victims who are married couples (the DaSilveiras, Roemmiches and Petersons), the counts include both members of the couple and are thus treated here as one investor.

[2] All statutory references are to the Corporations Code unless otherwise specified.

[3] The jury acquitted Cole of five counts of elder theft, two counts of burglary, one count of selling a security without a broker-dealer's license, and one count of selling a security by means of a false statement. The jury acquitted Robles of six counts of elder theft and two counts of burglary. The following counts were dismissed after the jury was unable to reach a verdict: For Cole—three counts of burglary, two counts of elder theft, one count of selling a security without a broker-dealer's license, and one count of selling a security by means of a false statement. For Robles—two counts of burglary and two counts of elder theft.

[4] As to Cole, the trial court reduced the Penal Code section 12022.6, subdivision (a)(2) enhancement to the lesser included enhancement of Penal Code section 12022.6, subdivision (a)(1) (aggregate losses of $50,000). As to Robles, the court struck the Penal Code section 12022.6, subdivision (a)(2) enhancement.

Cole contends all of his convictions must be reversed because the court denied his request to represent himself (see *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] (*Faretta*)), and did not suppress evidence that was obtained as the result of an unlawful detention and arrest. Cole also contends his convictions for burglary, elder theft, three counts of selling securities without a broker-dealer license, 10 counts of selling securities by means of making false statements, and the aggregate loss enhancements were not supported by substantial evidence. In addition, Cole claims the court committed instructional error, requiring reversal of all counts of selling securities without a broker-dealer license.

Robles contends that seven of his 11 convictions for selling securities by means of making false statements must be reversed because of insufficient evidence. With the exception of the *Faretta*, illegal arrest, burglary and elder theft issues, Robles also joins in and adopts the arguments made by Cole. (Cal. Rules of Court, rule 8.200(a)(5).)

For reasons we shall explain, we agree that there was insufficient evidence to support two of Cole's convictions of selling securities by means of making false statements (§ 25401) and one of Robles's convictions of the same crime. Further, 11 of Cole's convictions of selling a security without a broker-dealer's license (§ 25210) and eight of Robles's convictions of the same crime must be reversed because of instructional error. We reject the other contentions raised by Cole and Robles as lacking merit.

## FACTS

### Overview

From 1999 to mid-2002, at a time when there was a downturn in the stock market and financial institutions were offering extremely low interest rates, Cole, later joined by Robles, sold high-yielding, nonstock investments to elderly persons. At first, Cole sold elderly clients secured notes issued by a company that was offering an interest rate of 8 percent or more. The company in turn paid Cole a finder's fee, but he was not otherwise affiliated with the company. The company paid on time and the clients were satisfied with their investments. After Robles became Cole's partner, they continued selling these same secured notes and also sold direct investments in a pay telephone company.

Cole and Robles changed their methodology after authorities challenged the legality of the way they were conducting their investment business. In response, they formed several businesses, including Pathway Strategies, Inc. (Pathway Strategies), which sold its own promissory notes, and offered

double-digit rates of return. Pathway Strategies, in turn, invested the money it obtained in higher-yielding promissory notes issued by companies that needed to raise cash. Cole and Robles kept the difference between the interest rate they had promised clients and that paid to them by the companies in which they invested. In the beginning, the business plan performed well and their customers received their interest payments on time. However, after the major company in which it invested filed for bankruptcy, Pathway Strategies found it increasingly difficult to pay its customers their promised returns and it started investing in more speculative businesses and ventures. In addition, in order to raise more cash, Cole and Robles convinced some of their customers to take out reverse mortgages or home equity loans and invest their proceeds with Pathway Strategies. Pathway Strategies sometimes did not invest these funds as Cole and Robles told their customers it would. Eventually, Pathway Strategies stopped paying its customers their interest payments and did not return the customers' principal. After Cole and Robles terminated their business relationship, Cole continued to sell promissory notes in two other companies he owned until he was arrested.

### Background and Timeline

In the 1990's, Eric Scott Schoeller, a paralegal and document preparer, helped elderly clients establish living trusts. Attorney Frank Mango proposed that he perform free trust reviews for Schoeller's clients with the understanding that Mango might attempt to sell them investments. Schoeller agreed and gave Mango his client list with approximately 2,100 names. Under the proposal, Schoeller was to receive 1 percent of the sales commissions that Mango and his agents received.

Cole, a licensed life insurance salesman, worked for Mango. From 1999 to 2001, Cole reviewed the living trusts of some of Schoeller's clients—Ethel Correia, Leonora High, Marian Goins, and Elvira and Feliciano DaSilveira—and sold them secured notes in Carlmont Capital Special Purpose Corporation II (Carlmont Capital). Carlmont Capital invested in medical receivables in the small physician group segment of the health industry.[5] None of these individuals lost money by investing in Carlmont Capital. However, these clients lost considerable sums when Cole, and later Robles, revisited them and sold them investments in other corporations or in their own businesses. Cole and Robles sold these same high-risk investments to individuals who responded to newspaper advertisements they had placed or who were referred to them through word of mouth.

---

[5] In August 1999, Medical Capital Corporation, which issued the Carlmont Capital notes, agreed to pay Cole a finder's fee of 4 percent on the amount invested in Carlmont Capital notes by those individuals who made investments through Cole.

On September 10, 2000, advertisements began running in The San Diego Union-Tribune for an entity identified as Pathway Financial, offering a double-digit return. Five months later, on February 8, 2001, articles of organization for Pathway Financial, LLC, were filed with the Nevada Secretary of State. Cole and Robles were listed as managers of Pathway Financial. On October 20, 2000, Cole and Robles incorporated Pathway Strategies in Nevada and listed themselves as directors in the articles of incorporation. Cole and Robles used Pathway Financial, the partnership, for advertising and in correspondence; they used Pathway Strategies, the corporate entity, to issue the promissory notes.

Initially, Pathway Strategies promoted direct investments in Alpha Telcom/American Telecommunications (Alpha Telcom) which operated and maintained pay telephones in rural areas of the United States and sold these telephones to investors across the country. Alpha Telcom represented to its investors that their investments were guaranteed by its "buyback" insurance policy.[6] Alpha Telcom originally paid Robles a 12 percent commission for selling the telephones; this was later increased to 17 percent and then to 18 percent.

In November 2000, the California Department of Corporations (DOC) wrote to Cole informing him that Carlmont Capital, one of the investments he had been selling, may be a security within the meaning of the Corporations Code and that if it were, he did not have the requisite broker-dealer license. The letter asked Cole for further information. On the same day, DOC sent a similar letter to Robles. On February 7, 2001, the DOC issued Cole desist and refrain orders to stop selling investments in Carlmont Capital because it was not quilified as a security and to stop acting as a broker-dealer selling securities.[7]

At or about this same time, in the autumn of 2000, Pathway Strategies adopted a new business plan. Instead of selling direct investments in other companies, it offered its own promissory notes at double-digit returns to its clients. Cole and Robles represented that Pathway Strategies would lend these proceeds to Alpha Telcom and other companies that needed immediate cash and offered an interest rate higher than the promissory notes issued by Pathway Strategies. Pathway Strategies offered its investors a promised return and kept, as corporate profit, the interest it received that exceeded this promised return.

Some of these representations proved false, and Cole and Robles did not invest the investors' money as they indicated they would. By the summer of

---

[6] Initially, there were representations that an insurance policy was issued by Lloyd's of London, but later Alpha Telcom said its policy was through a Florida insurance company.

[7] Cole was served with these orders on August 1, 2001.

2001, Pathway Strategies' investors were no longer receiving their interest payments. At the end of August 2001, Alpha Telcom filed for bankruptcy. Cole and Robles's customers who had invested in Alpha Telcom—either directly or through Pathway Strategies promissory notes—did not receive their principal back. In February 2002, the United States District Court in Oregon found Alpha Telcom's pay phone program was an investment contract and constituted a security. (*S.E.C. v. Alpha Telcom, Inc.* (2002) 187 F.Supp.2d 1250, 1258.)[8]

Another investment promoted by Pathway Strategies during this time period was NatureWell, a late stage startup company that manufactured health care products. On June 28, 2001, Pathway Strategies invested $75,000 in NatureWell stock, and another $50,000 on July 30. NatureWell's subscription agreement for purchasing shares stated there was a high degree of risk and there was unlikely to be a market for the shares for a substantial period of time. In the summer of 2001, NatureWell's stock was selling for between 30 cents and 60 cents on the over-the-counter market. By February 2003, NatureWell stock was selling for between 2 cents and 4 cents. At the time of the trial, the stock was selling for about six-tenths of 1 cent. The chief financial officer of NatureWell testified that NatureWell was a risky investment in 2001.

Pathway Strategies also promoted investments in Tierra Telecom, Inc., which had developed "a proprietary black box that allowed voice-over Internet procedures." Tierra Telecom was a "restart-up" company that had previously failed and in the spring of 2001 was in dire financial straits. In July 2001, Pathway Strategies invested $125,000 in short-term Tierra Telecom promissory notes.

Between October 16, 2001, and February 4, 2002, articles of organization for Pathway Development, a limited liability company, were filed in Nevada;

---

[8] Cole, Robles and the district attorney agreed to the following stipulation: "Alpha Telcom filed for bankruptcy in August 2001. In September 2001, a receiver was appointed to take over operations of Alpha Telcom and to investigate Alpha Telcom's financial condition. The Securities and Exchange Commission, SEC, instituted an action against Alpha Telcom, its owner, Paul Rubera, and others in the United States District Court in Oregon under federal securities laws to stop Paul Rubera from further sales of unregistered securities and to disgorge profits to Paul Rubera from such sales. [¶] The SEC also sought [a] civil penalty against Paul Rubera for violating the antifraud provisions of the federal securities law . . . . [¶] The U.S. District Court filed its decision and findings on February 7th, 2002. The court found that one: The Alpha Telcom pay phone purchase program was a 'security' within the meaning of the federal law and is required to be registered. Paul Rubera was ordered to disgorge nearly $4 million in profits from the sales of the securities. [¶] Two, Paul Rubera, although the owner of Alpha Telcom, was not a sophisticated businessman. Paul Rubera did not act with intent to deceive, manipulate or defraud investors with respect to the financial condition of Alpha Telcom or the buy-back insurance program and was not ordered to pay civil penalties."

the last advertisement for Pathway Financial appeared in The San Diego Union-Tribune; and articles of incorporation were filed in Nevada for Pathway Management Group, Inc., listing Cole as secretary and Robles as vice-president.

In May 2002, Robles and Cole terminated their business relationship. On May 17, Pathway Strategies' list of officers was amended to list Robles as the sole owner.

Cole continued to do business through Investment Revolution Strategies, Inc. (Investment Revolution Strategies), and Faith Holdings, Inc. (Faith Holdings). Both were Nevada corporations that were incorporated in 1996 and 1998, respectively.

During the summer of 2002, Faith Holdings attempted to invest in a company installing electronic "point of sale" terminals for swiping credit cards used as payment in retail stores. Cole was raising money for this investment when he was arrested.

On July 16, 2002, an advertisement for Faith Holdings was published in The San Diego Union-Tribune. The advertisement was not published after July 23. On July 31, 2002, police arrested Cole.

*The Investors*[9]

(1) *Ethel Correia (counts 41 & 42 involving Cole and Robles)*

The jury convicted Cole and Robles of making false statements in connection with the sale of a security (§ 25401) and making a security transaction without a broker-dealer license (§ 25210) to Ethel Correia.

In 2000, Cole reviewed and notarized the trust of Correia, who was 78 years old at the time of the trial. Cole told Correia he could help her with her investments. He recommended Carlmont Capital and told Correia that she would receive 8.75 percent interest per month. Cole did not discuss the risk of the investment. On February 3, 2000, Correia invested $120,000 in Carlmont Capital and an additional $40,000 the following month.

Nine months later, in November 2000, Cole and Robles went to Correia's home and suggested she move her investment from Carlmont Capital to Pathway Strategies, which, in turn, would invest in Alpha Telcom and

---

[9] The second amended information contained counts involving two additional investor-victims, whose transactions are not discussed. All the counts involving these individuals were either dismissed or the jury returned not guilty verdicts on the counts.

provide her with a higher rate of return. Cole said there was no risk involved and the investment would be guaranteed by Lloyd's of London. Cole also told Correia that his grandfather had invested $1 million in the telecommunications company.[10] During the discussion, Robles sat quietly and listened.

Correia withdrew her money from Carlmont Capital, and in February and April 2001, invested a total of $160,000 in Pathway Strategies promissory notes with a 14 percent interest rate. Correia believed that Cole was the sole owner of Pathway Strategies. Cole did not tell Correia that he was not licensed to sell securities in California. Correia testified she would not have invested in Pathway Strategies had she known it was a risky investment. She also noted that Cole's statement about his grandfather investing in Alpha Telcom was a factor in her decision to invest.

Correia received monthly interest checks for a year from Pathway Strategies. After the checks stopped, Correia contacted Cole, who told her to speak with Robles. Robles in turn told her to speak with Cole. Robles told her that he and Cole had not invested her money in Alpha Telcom, and he did not know what Pathway Strategies had done with her money. Correia's principal was not returned to her.

(2) *Mair Nichols (count 25 involving Cole; counts 26 & 27 involving Cole and Robles)*

With respect to Mair Nichols, the jury convicted Cole and Robles of both securities crimes. Cole was also convicted of elder theft.

In 2000, Cole reviewed the trust of Nichols, who was 74 years old at the time of the trial. Cole told Nichols that he could put her money in a better investment than mutual funds. On April 12, Nichols invested $91,000 with Carlmont Capital for a three-year term. Cole discussed another investment with Nichols, but she did not have any more money to invest.

A few months later, Cole, accompanied by Robles, went to Nichols's residence and suggested she obtain a reverse mortgage on her house. Although Nichols was at first hesitant, Cole convinced her to proceed with a reverse mortgage. Nichols testified that Robles was "passive" and mostly listened to Cole during the meeting. On July 12, 2001, Nichols received a lump sum on a reverse mortgage for $122,000, and six days later, she invested $100,000 in a Pathway Strategies promissory note with a 10 percent interest rate. Cole told Nichols this was a no-risk investment and her $100,000 would "always be there" while also earning her monthly interest payments.

---

[10] The record contains no evidence that this was true.

In 2002, Cole convinced Nichols to cash out her Carlmont Capital investment before it matured and invest the proceeds in Pathway Strategies. On April 23, 2002, after Cole and Robles terminated their business relationship, Nichols invested $25,000 in Cole's company, Investment Revolution Strategies. Cole did not discuss the risk of this investment with Nichols; he told her he would invest the money for her.

Also in April 2002, Nichols invested $50,000 in Pathway Management Group, a Nevada corporation formed by Cole and Robles two months earlier. At trial, Nichols could not remember whether Cole or Robles suggested she make this investment. In May 2002, Nichols followed Robles's suggestion that she transfer $75,000 she had in an IRA to Pathway Management Group.

Neither Cole nor Robles told Nichols that they were not licensed to sell securities in California; Nichols stated that if they had, she would have given more thought to investing with them. Nichols did not receive her principal back on her $100,000 investment in Pathway Strategies or her $25,000 investment in Investment Revolution Strategies.[11] At one point, Nichols expressed her concern over the investments to Robles, who told her that he had $400,000 and could cover the amount of any loss she incurred. Robles later denied making this statement to Nichols.

(3)  *Marian Goins (counts 7 & 8 involving Cole)*

The jury convicted Cole of both securities crimes in his dealings with Marian Goins.

In 2000, Cole updated the trust of Goins and talked to her about her investments. Goins, who did not have any experience in investing, told Cole she did not want to make any high-risk investments. Goins, who was 74 years old at the time of the trial, invested with Cole because she trusted him and he told her she would get a better return. Cole did not tell Goins that he was not a licensed broker-dealer. In June 2000, Goins wrote checks for $41,000 and $61,000 to Carlmont Capital. Goins received a three-year promissory note at 9.25 percent interest. At the end of three years, Goins received her principal back.

Cole and Robles suggested Goins invest in Alpha Telcom. Initially, Goins was going to make the investment, but changed her mind after her daughter told her it was a bad idea.

---

[11] At the time of the trial, Nichols's accounts in Pathway Management Group were still open, and Nichols was receiving her quarterly interest payments.

(4) *Leonora High (counts 10 & 11 involving Cole and Robles)*

The jury convicted Cole and Robles of both securities crimes for their dealings with Leonora High.

In September 2000, Cole reviewed High's trust and discussed investments with her.[12] Robles also was present. Cole and Robles suggested High invest in Alpha Telcom, telling her they had invested $500,000 of their own money in Alpha Telcom. Cole and Robles did not discuss the risk of the investment and did not tell her that they were not licensed to sell securities in California. High had only $5,000 to invest, but Cole and Robles told her the minimum amount she could invest was $10,000. High borrowed money from her insurance policy to invest $10,000 in Alpha Telcom. On October 2, 2000, High executed a contract to purchase two pay telephones; Robles signed the contract as Alpha Telcom's "representative." At one point, High telephoned Cole and told him she wanted her money back. Cole said she could not get her principal back for 10 years. After four months, the interest payments stopped. Later, Cole and Robles sent High a letter informing her that Alpha Telcom had filed for bankruptcy.

(5) *Helen Labruzzi (counts 52 & 53 involving Cole and Robles)*

The jury convicted Cole and Robles of both securities crimes for their dealings with Helen Labruzzi.

In 2000, Cole was recommended to Labruzzi, who needed more money for living expenses and to help her children. Initially, Labruzzi, who was 85 years old at the time of the trial, invested her entire savings of $46,000 in Carlmont Capital; she received her interest on time and her principal was returned. Cole met with Labruzzi three or four times; Robles was present at some of these meetings. Cole told Labruzzi that he could arrange for her to get money out of her house. Cole set up a reverse mortgage and drafted a new will for Labruzzi.[13]

In late September 2000, Labruzzi invested $10,000 directly in Alpha Telcom. In October 2001, Labruzzi received a net sum of $124,896.76 from her reverse mortgage, which she invested in Pathway Strategies with the understanding that Pathway Strategies was to fully invest $124,000 for her. Neither Cole nor Robles discussed whether there would be any risk to her investments.

---

[12] High's testimony from the 2004 preliminary hearing was read to the jury after the court found she was unavailable to testify at trial. At the time of the preliminary hearing, High was 77 years old.

[13] In structuring the reverse mortgage, Cole put Labruzzi's house in his name. Later, an attorney for Labruzzi changed the beneficiaries to Labruzzi and her son and daughter.

Labruzzi received payments of $1,000 for two months. When the payments stopped, Labruzzi could not reach Cole. Robles told her that he did not know what happened to her money, and he was doing his best to pay it back. Of the $124,000 that Labruzzi invested with Pathway Strategies, records showed $99,000 went into Cole and Robles's payroll account. Bank records also showed that after Labruzzi's $124,000 check was deposited, Pathway Strategies did not make any investments. Labruzzi never received back the money she invested in Pathway Strategies and Alpha Telcom.

Cole and Robles did not tell Labruzzi that they were not licensed to sell securities in California. Had they made that disclosure, Labruzzi testified that she would have "investigated." Labruzzi also testified that if she had understood the reverse mortgage she would not have taken it out on her house.

(6) *Lisa Leginus (counts 15 & 16 involving Cole and Robles)*

The jury convicted Cole and Robles of both securities crimes for their dealings with Lisa Leginus.

Leginus met Robles in 1999 after she responded to a newspaper advertisement about investments. In 2000, Robles told Leginus he had found a good, sound investment for her. Subsequently, Cole and Robles went to Leginus's house and suggested she invest in an Oregon company selling and installing pay telephones (Alpha Telcom). Leginus told Cole and Robles that she needed to be very careful with her money and "absolutely could not lose this money." Leginus, who was 73 years old at the time of the trial, was initially skeptical because cell phones were so popular, but Cole and Robles said the pay telephones would be installed in the middle of the country where people did not use cell phones. Leginus testified that she thought Cole was angry about her hesitancy to invest; Cole told her: "[Y]ou can trust me, even my grandparents invested in this." Cole and Robles also said that her investment would be insured by a Florida bank.

On February 26, 2001, Leginus invested $30,000 in a Pathway Strategies promissory note with a 14 percent interest rate. Leginus understood the entire $30,000 would be invested in the pay telephones. Leginus received payments from Pathway Strategies for more than a year. After the payments stopped, Robles told her that he and Cole were splitting up as partners, and her funds were frozen. Robles also told her that they had not invested her money in the telephones; Robles did not tell her what they had done with her money.

Cole and Robles did not disclose to Leginus that they were not licensed to sell securities in California. Leginus said that if they had told her about their unlicensed status she would not have given them her "hard-earned money."

(7)   *Marjorie Maroun (counts 22 & 23 involving Cole and Robles)*

The jury convicted Cole and Robles of both securities crimes for their dealings with Marjorie Maroun.

According to her testimony at the preliminary hearing, Maroun invested $70,000 in Alpha Telcom on October 18, 2000.[14] She did not receive back her principal. Cole and Robles did not tell Maroun that they were not licensed to sell securities in California. Maroun was 81 years old at the time of the 2004 preliminary hearing.

(8)   *Henry and Helen Roemmich (counts 45 & 46 involving Cole and Robles)*

The jury convicted Cole and Robles of both securities crimes for their dealings with Henry and Helen Roemmich.

In February 2001, Schoeller helped the Roemmiches take out a reverse mortgage on their house. The Roemmiches received a lump sum of $135,000. Henry Roemmich (Roemmich) was 92 years old at the time of the trial. Shortly thereafter, Cole and Robles contacted Roemmich about investments. Cole and Robles advised Roemmich to invest $20,000 in a restaurant, $20,000 in a viatical,[15] and $20,000 with his stockbroker. Roemmich followed this advice.

On February 5, Roemmich and his wife invested an additional $60,000 in a 38-month Pathway Strategies promissory note with an interest rate of 14 percent. Cole and Robles promised they would never stop paying on the investment. The Roemmiches received interest payments for more than a year. When the payments stopped, Roemmich contacted Robles. Robles did not explain what happened with the Roemmiches' money and eventually stopped taking his telephone calls. Roemmich was unable to contact Cole. The Roemmiches did not receive back the principal on the $60,000 investment in Pathway Strategies, but did receive back the principal on the investments in the restaurant and the viatical.

The Roemmiches had never invested money before. Cole and Robles told them they had been in business for 14 years and had never missed a payment. Cole and Robles did not discuss risk with the Roemmiches. Cole and Robles

---

[14] In March 2000, Maroun had invested $25,000 in Carlmont Capital.

[15] A viatical is a sale of the life insurance policy of a terminally ill person to an investor so that the insured has money for support prior to death. When the insured dies, the investor receives a portion, or all, of the beneficiary proceeds of the policy.

did not tell the Roemmiches that they were not licensed to sell securities in California; had the disclosure been made, the Roemmiches would not have invested with them.

(9)  *Raymond Lovins (counts 20 & 21 involving Cole and Robles)*

The jury convicted Cole and Robles of both securities crimes for their dealings with Raymond Lovins.

In 2001, Lovins responded to a Pathway Financial newspaper advertisement for investments yielding 12 percent interest and met with Cole and Robles in their office. Cole and Robles recommended investing in a telephone company that was putting pay telephones in rural areas of the country (Alpha Telcom). Cole said he had never missed a payment on a note before, the telephone company was very strong, and the investment was practically "foolproof." Because Cole and Robles had initially tried to sell him viaticals, Lovins assumed Pathway Financial was associated with life insurance companies and was therefore a strong, secure company.

On May 14, 2001, Lovins invested $20,000 in a 38-month Pathway Strategies promissory note with a 12 percent rate of interest. Lovins, who was 58 years old at the time of the trial, acknowledged that he signed a disclaimer of guarantee on the note, but testified he read it "pretty fast" and believed the provision concerned the distinction between Pathway Financial and Pathway Strategies. Lovins received interest payments for three or four months. When the payments stopped, Lovins discovered the Pathway business telephone had been disconnected and its office was empty. Robles later told Lovins that he and Cole were no longer partners, but he expected Lovins to receive checks soon. Lovins never received his principal back.

Cole and Robles did not tell Lovins that they were not licensed to sell securities in California. Had Cole and Robles disclosed this, Lovins would have thought harder about whether to invest with them.

(10)  *Carol and Donald Peterson (counts 48 & 49 involving Cole and Robles)*

The jury convicted Cole and Robles of both securities crimes for their dealings with Carol and Donald Peterson.

At the time of the trial Carol Peterson was 68 years old and Donald Peterson was 70 years old. In April 2001, the Petersons responded to a newspaper advertisement for Pathway Financial offering a 12 percent return on investments and met with Cole and Robles in their business office. Cole

and Robles said they would make bridge loans that were "absolutely safe" investments in companies they had investigated with due diligence. Cole and Robles did not specify the companies in which they would invest the Petersons' money. Carol Peterson recalled a discussion about a company that installed pay telephones and a company developing "[v]oice-over Internet" software. Robles told the Petersons: "You don't need to worry about your investment. This is absolutely safe. We've done the due diligence." They also said the district attorney's office had looked at their business, and a Small Business Administration employee and a former FBI agent wanted to work for them.

In June 2001, the Petersons invested $90,000 in a 38-month Pathway Strategies promissory note with a 10 percent interest rate. When Carol Peterson asked Cole and Robles whether they needed to be licensed "by anybody," she was told that no license was required.

Following Cole and Robles's advice, the Petersons obtained a home equity loan for $208,000. On September 12, the Petersons made two more investments with Pathway Strategies—one for $100,000 and one for $67,000. In consideration for the $100,000 investment, the Petersons received a 38-month promissory note at 10 percent interest. The $67,000 promissory note provided the Petersons were to receive 10 percent interest plus 60 percent of any interest Pathway Strategies received over 14 percent.

Also in September, based on the advice of Cole and Robles, the Petersons invested $25,000 directly with NatureWell; Cole and Robles received a commission. Cole and Robles told the Petersons the value of the NatureWell stock would probably triple in three years. Carol Peterson had tried NatureWell's migraine headache medicine and contact lens products and thought they were very good.

The Petersons also invested $78,000 in a viatical purchased through Mutual Benefits of Florida, a company promoted by Cole and Robles. The Securities and Exchange Commission issued a restraining order against Mutual Benefits of Florida, and none of this investment was returned to the Petersons.

In July 2002, the Petersons stopped receiving monthly interest payments on their investments. Over the next 12 months, Robles continued to tell Carol Peterson that he would find a way to bring the interest payments up to date through various income-generating plans. None of them came to fruition. Robles did not return Carol Peterson's telephone calls after July 31, 2003. The Petersons did not receive back the principal on their investments.

(11)  *George Quintero (counts 34 & 35 involving Cole and Robles)*

The jury convicted Cole and Robles of both securities crimes for their dealings with George Quintero.

In 2001, Cole went to Quintero's home to review his trust. Cole asked Quintero, who was 77 years old at the time of the trial, if he was interested in other investments. Cole told Quintero that with a minimum investment of $25,000, he could invest in a promissory note that paid 8 percent interest or in a viatical.

In June 2001, Quintero went to Cole and Robles's office and invested in a 36-month viatical and a 14-month $25,000 Pathway Strategies promissory note with an interest rate of 8 percent. The 14-month term of the promissory note would allow Quintero to use the principal for his planned 50th wedding anniversary celebration in Europe. Cole and Robles told Quintero that the investment was risk free. Cole and Robles did not tell Quintero that they were not licensed to sell securities in California. Quintero testified that such a disclosure would have "[a]bsolutely" made a difference in his decision to invest with Cole and Robles.

Quintero received interest payments for 10 months. When the payments stopped, Quintero telephoned and drove to Pathway's offices to no avail. Quintero was told that Cole and Robles had moved out the previous day. Cole later told him that Robles had fired him and kept the money. Robles told Quintero that he did not know what happened to his money, but he would try to return it. Quintero never received his principal on the investment.

(12)  *Albert Flory (counts 5 & 6 involving Cole and Robles)*

The jury convicted Cole and Robles of both securities crimes for their dealings with Albert Flory.

In 2000, Flory met Cole and Robles after responding to an advertisement in The San Diego Union-Tribune about well-secured investments yielding interest payments exceeding 12 percent. Cole and Robles told Flory, who was 86 years old at the time of the trial, that they offered various investments and they would put his money in the one with the highest interest yield. Flory told Cole and Robles: "[If] you lose my money, you lose your life." Cole and Robles responded the risk was low; it was as "good as gold."

On July 24, 2001, Flory invested $60,000 in a one-year Pathway Strategies promissory note with a 12 percent interest rate. At the end of the year, Flory did not receive the principal back. Flory telephoned Cole and Robles, but

their business telephone had been disconnected. Their office was empty. Robles later told Flory that he was trying to collect about $200,000 from other investments.

Cole and Robles did not tell Flory they were not licensed to sell securities in California. Robles showed Flory a card that indicated he was licensed in Nevada. Flory would have acted earlier to recoup his investment had he known that Cole and Robles did not have a license to sell securities in California.

### (13) *Elvira and Feliciano DaSilveira (counts 1 & 2 involving Cole)*

The jury convicted Cole of both securities crimes for his dealings with Elvira and Feliciano DaSilveira.

In 2000, Cole reviewed the trust prepared by Schoeller for Elvira and Feliciano DaSilveira, who at the time of the trial were 56 years old and 62 years old respectively. Cole suggested they invest in Carlmont Capital. Cole told the DaSilveiras that it was a low- or no-risk investment. In June 2000, the DaSilveiras invested $81,000 in Carlmont Capital and received their money back after the note matured on July 6, 2001.

In 2002, Cole told Elvira DaSilveira that if she invested in his company, Faith Holdings, she would receive a 10 percent return. Cole said the new investment was low or no risk. On July 1, the DaSilveiras transferred their life savings of $104,000 to Faith Holdings, believing the entire amount was to be invested in a credit card machine company. On August 5, a superior court judge ordered Cole's Faith Holdings bank account frozen; the DaSilveiras eventually received their money back.

### (14) *Elizabeth Petersen (counts 28, 29, 30 & 31 involving Cole)*

The jury convicted Cole of residential burglary, elder theft and both securities crimes for his dealings with Elizabeth Petersen.

On July 30, 2002, Cole went to Petersen's house after she responded to a newspaper advertisement for Faith Holdings that promised a 10 percent return. Petersen, who was 80 years old at the time of the trial, told Cole that she had approximately $100,000 to invest. Cole suggested Petersen purchase a promissory note issued by Faith Holdings and indicated the money would be invested in a "mom and pop" trucking company, a rest home in Florida, and a company that marketed machines to process credit card purchases for supermarkets. Cole did not discuss the risk of these investments; he also did not tell Petersen that he was not licensed to sell securities in California.

Petersen decided to invest with Cole, who insisted that she obtain a cashier's check. Cole said he would return in a few hours after Petersen went to the bank. Petersen wanted to check out Cole and was referred to the office of the Secretary of State. She left a message with the office. When Cole returned, Petersen gave him a cashier's check for $100,000, and he gave her a promissory note. After Cole left, someone from the office of the Secretary of State returned Petersen's call and informed her that Cole had lost his brokerage license. Petersen contacted the district attorney's office.

Petersen telephoned Cole and told him that she wanted to invest another $100,000, and she and Cole set up an appointment for the following day. When Cole returned on July 31, two police detectives were in an adjoining room listening to the conversation between Cole and Petersen. Other police detectives were situated outside so they could arrest Cole when he left the house.

Cole brought another Faith Holdings promissory note for Petersen. In response to an inquiry from Petersen, Cole told her he did not have to be licensed because he was a principal in the corporation. When Petersen pointed out that the name of the company was not on the promissory note, Cole said he would retrieve a company stamp from his car, and promptly left the house. The detectives in the house did not have time to alert the detectives outside not to arrest Cole at that time. Cole was arrested outside Petersen's house.

On August 5, Faith Holdings' bank account was frozen by court order. Petersen's money was returned to her approximately one month later.

## DISCUSSION

### I.–IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### V. *Challenges to the Convictions for Selling Securities Without a Broker-dealer License (§ 25210)*

Cole, joined by Robles, contends the convictions for selling securities without a broker-dealer license (§ 25210) must be reversed on three grounds. With respect to counts 8, 11 and 23 (involving investments with Carlmont Capital and/or Alpha Telcom), Cole claims he and Robles did not know these investments were securities. Second, Cole maintains the remaining counts

---

*See footnote, *ante*, page 452.

(involving investments with the Pathway entities, Faith Holdings, and Investment Revolution Strategies) must be reversed because he and Robles were not broker-dealers within the statutory definition, and even if their activities fell within the statutory definition there was insufficient evidence to support this factual finding. Third, Cole maintains all of the convictions for violating section 25210 must be reversed because the court's instructional errors (a) reduced the crime to a strict liability offense, (b) deprived them of a mistake of law defense, and (c) eliminated the affirmative defense of a good faith belief that one is exempted from the licensing requirement of section 25210. For reasons we shall explain, we agree instructional error eliminated their good faith affirmative defense and conclude the error was prejudicial as to certain counts. We reject the other claims.

### General Legal Principles

In order to assess the validity of these contentions, we first address the mental states required to establish a criminal violation of section 25210 and next examine affirmative defenses.

■ Section 25210 was enacted as part of a comprehensive reform of California's securities laws passed by the Legislature as the Corporate Securities Law of 1968 (the Corporate Securities Law). (§ 25000 et seq.; see generally 1 Marsh & Volk, Practice Under the Cal. Securities Laws (2007) § 1.01 et seq. (Marsh & Volk).) The primary objective of the Corporate Securities Law was the "creation of a balanced regulatory scheme to cope with the problems of modern securities markets in California." (Marsh & Volk, *supra*, § 1.01, p. 1-3.) As is relevant here, all offers and sales of securities in California must be qualified with the Commissioner of the DOC (the Commissioner) unless specifically exempted. (§ 25110.) Only broker-dealers may sell securities, unless exempted. (§ 25210.) Deceptive practices, such as utilizing false or misleading statements in the purchase or sale of securities, are prohibited. (§ 25401.)

■ Section 25210 provides that unless statutorily exempted, "no broker-dealer shall effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless the broker-dealer has first applied for and secured from the commissioner a certificate, then in effect, authorizing that person to act in that capacity." (§ 25210, subd. (a).) A violation occurs when an individual acting in the capacity of a broker-dealer (as defined by statute) sells a security (also defined by statute) without the requisite certificate (license). The focus of this section is directed at the individual acting in the capacity of a broker-dealer, as opposed to those sections (i.e., § 25110) that focus on the nature of the instrument sold to the

public. The license requirement is designed to regulate the conduct of those selling securities, thereby protecting the public against unscrupulous operators.

Section 25540, subdivision (a), sets forth the criminal sanctions for violations of section 25210. It provides: "Except as provided for in subdivision (b), any person who *willfully* violates any provision of this division, or who *willfully* violates any rule or order under this division, shall upon conviction be fined not more than one million dollars ($1,000,000), or imprisoned in the state prison, or in a county jail for not more than one year, or be punished by both that fine and imprisonment; but no person may be imprisoned for the violation of any rule or order if he or she proves that he or she had no knowledge of the rule or order." (§ 25540, subd. (a), italics added.)[19]

There is little authority examining the mental state required for criminal violations of section 25210. We find guidance in two California Supreme Court cases which address this issue in related statutes: *People v. Simon* (1995) 9 Cal.4th 493 [37 Cal.Rptr.2d 278, 886 P.2d 1271] (*Simon*), dealing primarily with misrepresentations in the sale of securities (§ 25401); and *People v. Salas* (2006) 37 Cal.4th 967 [38 Cal.Rptr.3d 624, 127 P.3d 40] (*Salas*), dealing primarily with the sale of unregistered or unqualified securities (§ 25110).

In the seminal case of *Simon*, the high court analyzed whether section 25401, which prohibits the sale or purchase of securities by means of written or oral communications containing materially false statements or omissions, requires a culpable mental state. The court concluded that it did, rejected the contention that section 25401 is a strict liability crime, and placed on the prosecution the obligation of showing the defendant had guilty knowledge that the statements he or she made were false. (*Simon, supra*, 9 Cal.4th at pp. 507–522.) The court reached these conclusions even though the statute itself does not expressly require knowledge of the false or misleading nature of a statement or omission to disclose.

In reaching its conclusion that violation of section 25401 requires a culpable mental state, the *Simon* court relied on several factors. First, it noted that section 25540, the section that sets forth the criminal penalties for violations of the Corporate Securities Law, proscribes only " 'willful' " violations. Such language, the court pointed out, typically connotes a crime is a general intent crime—not a strict liability crime—and observed that general

---

[19] Section 25540, subdivision (a) sets forth the punishment for nonfraudulent violations of the Corporate Securities Law. Fraudulent violations, such as making misrepresentations in the sale of securities (§ 25401), are punishable by a maximum $10 million fine and/or imprisonment for two, three or five years. (§ 25540, subd. (b).)

intent crimes ordinarily required mens rea, scienter or wrongful intent. (*Simon, supra*, 9 Cal.4th at pp. 507, 519.) Second, the *Simon* court recognized that the imposition of criminal liability without the requirement of criminal intent or criminal negligence is the exception and is usually reserved for a crime aimed at "protect[ing] public health and safety and [one where] the penalties are relatively light." (*Id.* at p. 521.) Section 25401, it observed, does "not involve conduct which threatens the public health or safety" and the punishment for a violation of the statute, prison and substantial fines, is not a light one. (*Simon, supra*, at p. 521.) Third, the legislative history strongly reflected an intent to impose criminal liability only for *intentional* misstatements in the sale of securities. (*Id.* at p. 513.) Fourth, the *Simon* court applied the rule of leniency: " 'The defendant is entitled to the benefit of every reasonable doubt,' " including questions arising from " 'the construction of language used in a statute.' " (*Id.* at pp. 517–518.)[20]

After rejecting the notion that section 25401 is a strict liability crime, the *Simon* court further determined that section 25401 required a showing that the defendant had "knowledge of the falsity or misleading nature of a statement or of the materiality of an omission, or criminal negligence in failing to investigate and discover them" and made clear that guilty knowledge is an element of the crime. (*Simon, supra*, 9 Cal.4th at p. 522.)[21] In reaching this conclusion, the court relied heavily on a related section which permits private individuals to seek tort damages for violations of section 25401. (§ 25501.) The court emphasized that although private actions are allowed, an injured investor is entitled to damages "*only* if the seller was aware of or was negligent in failing to be aware that his representations were misleading." (*Simon, supra*, at p. 516; see § 25501.) The court found it highly unlikely the Legislature intended to require knowledge of the falsity of a statement or materiality of an omission for recovery in a civil action while allowing imposition of substantial criminal penalties (at that time prison and $10,000 fine) on the seller of securities regardless of the seller's knowledge that his or her statements were false or misleading. (*Simon, supra*, at p. 517.) "We presume the Legislature did not intend to enact a statute of doubtful validity. If knowledge or criminal negligence is not an element of [section 25401], criminal penalties would be imposed for conduct less culpable than that for which recovery in a private civil action is not permitted, an unreasonable application of the statutory scheme." (*Id.* at p. 522.)

---

[20] The *Simon* court also justified its holding on other factors unique to section 25401, and therefore not relevant to an analysis of section 25210. (See *Salas, supra*, 37 Cal.4th at p. 978.)

[21] Although the six-to-one majority in *Simon* did not expressly label section 25401 a "specific intent crime," the effect was the same, as the lone dissenter noted. (*Simon, supra*, 9 Cal.4th at p. 524 (dis. opn. of Mosk, J.).)

A decade after *Simon*, our Supreme Court in *Salas, supra*, 37 Cal.4th at page 981, revisited the Corporate Securities Law and applied the teachings of *Simon* to section 25110, which prohibits any person from selling unregistered or unqualified securities. The court held section 25110 is not a strict liability crime and requires a showing of criminal culpability. The *Salas* court reiterated *Simon*'s observation that mens rea generally attaches to criminal offenses, except for those limited situations involving public health or safety and imposing relatively light penalties. The *Salas* court concluded this general rule applied to section 25110, noting that section 25110, like section 25401, does not relate to public health and safety, and it imposes severe punishment—up to a $1 million fine and a three-year prison term. (*Salas, supra*, at p. 978.) The *Salas* court also rejected the Attorney General's argument that *Simon* should be overruled and pointed out that the basic principles that led the *Simon* court to find section 25401 was not a strict liability offense are still valid and apply equally to section 25110. (*Salas, supra*, at p. 979.) "In *Simon*, we invited the Legislature to clarify which criminal violations of section 25540, enacted as part of the Corporate Securities Law of 1968—which includes both sales by misrepresentation or omission (the issue in *Simon*) and sales of an unregistered security (the issue here)—'are strict liability offenses and what mental states are elements of those which require scienter.' (*Simon, supra*, 9 Cal.4th at p. 510, fn. 13.) But although the Legislature has frequently amended the Corporate Securities Law of 1968 in the 10 years since we decided *Simon*, it has not abrogated *Simon* or clarified the mens rea of crimes punishable under section 25540. We infer legislative acquiescence in *Simon*'s conclusion that a conviction for unlawful sale of securities that entails a relatively severe punishment requires guilty knowledge." (*Salas, supra*, 37 Cal.4th at p. 979.)

However, the *Salas* court departed from the *Simon* analysis regarding scienter and burden of proof. (*Salas, supra*, 37 Cal.4th at p. 982.) Whereas *Simon* held that knowledge of the falsity of a statement or the materiality of an omission (or criminal negligence) was an element of section 25401, which the prosecution was obligated to prove, in *Salas* the high court held guilty knowledge is not an element of section 25110. Instead, it concluded that a defendant's reasonable good faith belief that a security is exempt from registration is an affirmative defense for which the defendant bears the initial burden of proof. (*Salas, supra*, at p. 982.)

In part, this conclusion was driven by practical considerations and, in part, by statutorily mandated burdens of proof. The *Salas* court reasoned that because the Legislature, in enacting the Corporate Securities Law, had prohibited the sale of unregistered or unqualified securities, but had identified 30 statutory exemptions for section 25110 violations (and given DOC the authority to authorize even more), prosecutors could face a difficult practical problem trying to prove that a defendant knew that a security was exempt.

(*Salas, supra*, 37 Cal.4th at p. 981.) Additionally, as part of the Corporate Securities Law, the Legislature specifically placed on the defendant the " 'burden of proving an exemption or an exception from a definition.' " (*Salas, supra*, at p. 981; see § 25163.) In light of these considerations, the *Salas* court applied the "rule of convenience and necessity" (which places the burden of proving an exonerating fact on the defendant if the fact's existence is peculiarly within the defendant's knowledge and proof of its nonexistence would be difficult), and held "lack of knowledge that a security is not exempt (or criminal negligence) is an affirmative defense, on which the trial court must instruct only if the defendant presents enough evidence to raise a reasonable doubt." (*Salas, supra*, at pp. 981–982.)

In large measure, the conclusions reached in *Simon* and *Salas* and the rationale supporting those holdings resolve the issues raised in this appeal concerning the mental states associated with violations of section 25210. Applying this reasoning, we conclude that section 25210 is a general intent crime, not a strict liability offense, and that a defendant's reasonable good faith belief he or she was not required to have a license is an affirmative defense; guilty knowledge is not an element of the crime.

■ Like the sections analyzed in *Simon* and *Salas*, the penalties that can be imposed for violating section 25210 are identified in section 25540 and require "willful" conduct. As these cases make clear, a statute proscribing "willful" behavior typically is a general intent crime, as opposed to a strict liability offense. (See also *People v. Johnson* (1998) 67 Cal.App.4th 67, 72 [78 Cal.Rptr.2d 795]; *People v. King* (2006) 38 Cal.4th 617, 623 [42 Cal.Rptr.3d 743, 133 P.3d 636].) Similarly, strict liability is usually reserved for crimes that relate to public health and safety *and* impose relatively light penalties (*Simon, supra*, 9 Cal.4th at p. 521; *Salas, supra*, 37 Cal.4th at p. 978), criteria that do not apply to section 25210. Moreover, the high court's observation that the legislative history preceding passage of the Corporate Securities Law evidenced an intent to criminalize only intentional conduct applies with equal force to sections 25210, 25401 and 25110.

In considering whether guilty knowledge is an element of section 25210 or relevant to an affirmative defense, we find section 25210 more analogous to section 25110 than it is to section 25401, and apply the reasoning of the *Salas* court. First, sections 25210 and 25110 share a similar purpose: to assure that the DOC has regulating authority over securities transactions in the state, with section 25210 proscribing an unlicensed broker-dealer from selling securities, and section 25110 proscribing the sale of unqualified or unregistered securities. Similarly, unlike section 25401, sections 25210 and 25110 explicitly refer to exemptions, and the Legislature has placed the burden of

proving exemptions on the defendant. (See § 25163.) Unlike section 25401,[22] which involves fraudulent conduct, neither section 25210 nor 25110 per se involves fraudulent acts, and perpetrators of sections 25210 and 25110 crimes are subject to lesser criminal punishment under section 25540, subdivision (a) than violators of section 25401. (See fns. 19 & 22, *ante*.) Finally, as noted in *Simon*, a compelling reason for its holding that guilty knowledge is an element of criminal violations of section 25401 was the fact that the comparable civil statute (§ 25501) required guilty knowledge before an injured investor could prevail in a civil action for damages against a seller who made misleading statements in the sale of a security. (*Simon, supra*, 9 Cal.4th at pp. 509, 516–517.) The court understandably rejected the notion that a civil litigant seeking damages had to prove that the defendant knew the statements were misleading, but that a prosecutor seeking criminal penalties was relieved from this obligation. By contrast, the comparable statutes allowing for civil actions of sections 25210 and 25110 (§§ 25501.5, 25503)[23] do not require guilty knowledge on the part of the seller.

Accordingly, we conclude that "guilty knowledge" that a broker-dealer's license was required is not an element of section 25210. Rather, section 25210 is a general intent crime, and "no further mental state beyond willing commission of the act proscribed by law" is required. (*People v. Sargent* (1999) 19 Cal.4th 1206, 1215 [81 Cal.Rptr.2d 835, 970 P.2d 409].) "In other words, it is sufficient for a conviction if the defendant intentionally did that which the law declares to be a crime." (*In re Jerry R.* (1994) 29 Cal.App.4th 1432, 1437–1438 [35 Cal.Rptr.2d 155].) But guilty knowledge is relevant as an affirmative defense and a nonlicensed broker-dealer who participates in a securities transaction in this state can affirmatively defend himself or herself on the basis of a reasonable and good faith belief that he or she is exempt from the licensing requirement of section 25210, and/or a reasonable and good faith belief that he or she is excluded from the statutory definition of broker-dealer. (See § 25004.)[24] The defense bears the initial burden of proof on this issue, and if the defense presents enough evidence to

---

[22] Section 25401 is located in the Corporations Code under the heading "Fraudulent and Prohibited Practices" under the Corporate Securities Law of 1968. (Tit. 4, div. 1, pt. 5.) Furthermore, the criminal penalties for violations of section 25401 and two other fraudulent securities sections are higher than those for other violations of the Corporate Securities Law. (See § 25540, subds. (a), (b).)

[23] Section 25501.5 was enacted in 2004. (Stats. 2004, ch. 575, § 2.) The Legislature also amended Code of Civil Procedure section 1029.8, which makes specified unlicensed persons who injure others liable for treble damages, to include broker-dealers. (Stats. 2004, ch. 575, § 1.)

[24] The parties repeatedly use the word "exempt" from the licensing requirement of section 25210 even though factually the statutory exemptions do not apply here. A broker-dealer is exempt from the requirements of section 25210 if, among other things, the broker-dealer (a) is registered under the Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq.); (b) has not previously had a certificate denied or revoked; and (c) has no place of business in California

raise a reasonable doubt that the defendant believed he or she was exempt or excluded from the licensing requirement of the statute, the court is required to instruct on this affirmative defense.

Cole, joined by Robles, mistakenly argues that the *Simon* court held that an element of section 25110 (sale of a nonexempt security that has not been registered with the DOC) is knowledge that the sold security was unregistered or unqualified, and, therefore, we should find that an element of the analogous section 25210 is knowledge that the broker-dealer's license is required. We reject this argument because the premise is wrong. *Simon* did not hold an element of section 25110 is knowledge that the security was unregistered or unqualified. The *Simon* court did address section 25110, but not on the issue of scienter. Rather, the court considered the defendant's challenge to his convictions under section 25110 based on instructional error. The *Simon* court held it was error not to instruct "on the magnitude of a defendant's burden of proof" when he or she offers an " 'exemption' defense." (*Simon, supra,* 9 Cal.4th at p. 496.) The high court did not hold knowledge is an element of section 25110.

*Analysis*

1) *Violations of section 25210 involving Carlmont Capital and Alpha Telcom*

Cole and Robles contend their convictions under section 25210 involving investments in Carlmont Capital and Alpha Telcom must be reversed because these transactions took place before it was legally determined that the transactions involved securities. In essence, Cole and Robles argue they did not have knowledge that the investments they sold in Carlmont Capital and Alpha Telcom were securities transactions, and, therefore, they cannot be held criminally liable for selling these investments without a broker-dealer license. The contention is without merit.

■ As noted, section 25210 is a general intent crime. Knowledge that an investment is a security (and therefore requires a broker-dealer license) is not an element of criminal violations of section 25210. Although the prosecution must prove that the particular investment is a security as defined by statute (see § 25019), that is a question of fact for the jury. (*People v. Frederick* (2006) 142 Cal.App.4th 400, 413 [48 Cal.Rptr.3d 585].) Here, the jury was

and does not direct offers to sell or buy in the state except to designated persons or institutions. (§ 25200.) On this factual record, the exemptions have no relevance to this case. A more accurate nomenclature for the defense presented by Cole and Robles is they were excluded from the statutory definition of broker-dealer (§ 25004) and therefore did not require broker-dealer licenses.

properly instructed on the definition of a security, and determined the investments were securities. All that is required under section 25210 is that Cole and Robles intentionally committed the proscribed act—selling securities without a broker-dealer's license. Assuming arguendo that at the time Cole and Robles sold investments in Carlmont Capital and/or Alpha Telcom they had no license and did not know the investment they were selling was a security, all the elements of the crime would have been satisfied nonetheless.

To the extent the appellants are arguing that at the time they sold Carlmont Capital and/or Alpha Telcom there had been no legal determination the notes were securities, the argument fails. The licensure requirement of section 25210 is designed to protect the unsophisticated investing public from unscrupulous and incompetent broker-dealers; among other things, to become a licensed broker-dealer, one must qualify by examination and meet financial responsibility requirements. It would be antithetical to the protective purpose of section 25210 if the statute came into play *only* when there has been a legal determination that an investment is a security. If that were the case, there would be no protection for investors whose investments predated the legal determination by effectively giving nonlicensed broker-dealers immunity for their illegal conduct (selling securities without a license).[25]

### 2) *Violations of section 25210 involving Pathway entities, Investment Revolution Services and Faith Holdings*

With respect to the investments they solicited in Pathway Strategies, Investment Revolution Services and/or Faith Holdings, Cole and Robles contend the prosecution failed to prove that they were broker-dealers and therefore needed to be licensed under section 25210.[26]

The basis of Cole and Robles's argument is that they were not acting as broker-dealers when they sold promissory notes issued by their own corporate entities because in those transactions they did not fall within, or were excluded from, the statutory definitions of broker-dealer. If one is not a broker-dealer, their argument continues, he or she does not violate section 25210 by not having a broker-dealer's license. We agree section 25210 is not violated if the defendant is not a broker-dealer as defined by section 25004, or fits within one of the enumerated exclusions. But their argument fails as they have misinterpreted the relevant statutes.

[25] Appellants' reliance on language in section 25540 that requires knowledge for violations of a DOC rule or order is misplaced. Cole and Robles were prosecuted for selling securities without a broker-dealer's license in violation of section 25210—not for violating a DOC rule or order.

[26] Neither Cole nor Robles dispute that these investments were security transactions.

Both Cole and Robles met the statutory definition of broker-dealer and did not fall within any exclusions to the definition of broker-dealer. " 'Broker-dealer' means any person engaged in the business of effecting transactions in securities in this state for the account of others or for his own account." (§ 25004, subd. (a).) It excludes the issuer of the security and an agent of the issuer or the broker-dealer.[27]

Cole and Robles admit they met the definition of a broker-dealer and acknowledge they were not the issuers of the Pathway Strategies, Investment Revolution Strategies and Faith Holdings promissory notes they sold; rather, the corporate entities were the issuers. Instead, Cole and Robles argue they were not broker-dealers because they fall within the following exclusionary language of the statute: " 'Broker-dealer' does not include . . . [¶] . . . [¶] (2) An agent, when an employee of a broker-dealer or issuer." (§ 25004, subd. (a).) The argument fails.

An agent is defined in section 25003 as any person who represents either a broker-dealer or an issuer in effecting or attempting to effect purchases or sales of securities. (§ 25003, subd. (a).) Section 25003 further provides that an officer or director comes within the definition of an agent if he or she receives a commission for the purchase or sale of the securities. (§ 25003, subd. (d).) Cole and Robles were far more than employees of these three corporations; they were corporate officers and/or directors. As such, they could only be agents if they received a commission for the sale of these securities. (§ 25003, subd. (d).) There was no evidence that either Cole or Robles received a commission in connection with the promissory notes they sold in Pathway Strategies, Investment Revolution Strategies or Faith Holdings. As corporate officers/directors who did not receive a sales commission, Cole and Robles were not agents within the meaning of section 25003 and therefore do not fall within the exclusion for agents in the definition of broker-dealer in section 25004. As broker-dealers, Cole and Robles were required to obtain a license to sell securities, and their failure to do so was in violation of section 25210.

Our interpretation of the statutory language is in keeping with the broad scope of the Corporate Securities Law in protecting the public from unscrupulous practices in the sale of securities. " 'The approach of the 1968 California Corporate Securities Law is to sweep *all* transactions in securities

---

[27] Section 25004, subdivision (a) provides in pertinent part: " 'Broker-dealer' means any person engaged in the business of effecting transactions in securities in this state for the account of others or for his own account. 'Broker-dealer' also includes a person engaged in the regular business of issuing or guaranteeing options with regard to securities not of his own issue. 'Broker-dealer' does not include any of the following: [¶] (1) Any other issuer. [¶] (2) An agent, when an employee of a broker-dealer or issuer."

within the regulatory net . . . . The 1968 Law then specifically exempts those transactions and securities where regulation is considered unnecessary or too burdensome.' " (*Nationwide Investment Corp. v. California Funeral Service, Inc.* (1974) 40 Cal.App.3d 494, 502 [114 Cal.Rptr. 77], quoting *Nonissuer Transactions Under the California Corporate Securities Law of 1968* (1968) 21 Stan. L.Rev. 152, 157.) The Court of Appeal continued: "We also believe the 1968 act was designed to prevent individuals or others from operating in certain fringe areas of security transactions without a license." (*Nationwide Investment Corp., supra*, at p. 502.)

We reject Cole's convoluted interpretation that officers and/or directors who do not receive sales commissions should be excluded as well. Cole claims there is no logical reason to differentiate between officers and/or directors who receive sales commissions and those who do not. He argues: "The only logical way to read the statutes is to identify section 25004, subdivision (a)(1)'s exemption [exclusion] of 'any other issuer' as extending to officers of corporate issuers when those officers are not receiving commissions." According to Cole, "[t]his makes sense because . . . the officer is not receiving special compensation for selling his corporation's securities, the seller of the securities is in effect the corporation, *the issuer*, and the issuer does not need a broker-dealer license."

As an appellate court, we must presume the Legislature meant what it said in section 25003, subdivision (d)—namely, corporate officers or directors are agents only when they receive a sales commission. In the absence of positive evidence to the contrary regarding the intent of the Legislature, we must interpret clear and unambiguous statutes in a clear and unambiguous manner. (*Nationwide Investment Corp. v. California Funeral Service, Inc., supra*, 40 Cal.App.3d at p. 502.) Cole and Robles's argument is one that is appropriately made to the Legislature, not to this court. Had the Legislature intended to exclude all corporate officers and/or directors from the definition of broker-dealer—and therefore from culpability under section 25210—it could have done so. Instead, the Legislature wrote and enacted section 25003, subdivision (d).

Further, in our view, Cole and Robles's interpretation is inconsistent with policy reasons behind the Corporate Securities Law. Under their argument, the law would allow individuals to set up a corporation and sell securities without any oversight or licensing, which would be in conflict with the purpose of the Corporate Securities Law. By requiring a licensee to meet "minimum standards of training, experience, miscellaneous qualifications, and appropriate examinations," the licensing statute protects the public. (*Nationwide Investment Corp. v. California Funeral Service, Inc., supra*, 40 Cal.App.3d at p. 503.)

In a related claim, Cole and Robles argue there was insufficient evidence that they were broker-dealers subject to the licensing requirement of section 25210 when they sold promissory notes involving the Pathway entities, Investment Revolution Strategies and/or Faith Holdings. We disagree. Both the prosecution and Cole presented expert testimony on the issue. The prosecution securities expert opined that Cole and Robles were acting as broker-dealers and were required to be licensed. The defense expert disagreed. Cole and Robles attack the prosecution's securities expert, claiming his testimony was not credible and the defense securities expert's testimony was credible. It is the jury's job to assess the credibility of witnesses, and a reviewing court cannot reweigh the evidence. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078 [119 Cal.Rptr.2d 859, 46 P.3d 335].) " '[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which a determination depends.' " (*People v. Thornton* (1974) 11 Cal.3d 738, 754 [114 Cal.Rptr. 467, 523 P.2d 267], disapproved on another ground in *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1].) There was substantial evidence that Cole and Robles were brokers-dealers. Additionally, the jury was properly instructed as to the statutory definitions and exclusions, and it made a factual determination that Cole and Robles were broker-dealers.

### 3) *Jury instructions on section 25210*

Alternatively, as to all counts involving appellants' lack of broker-dealer licenses, Cole and Robles contend the trial court erred when it instructed the jury (1) on the necessary mental state required to violate section 25210, and (2) that a mistake of law is not a defense. These contentions are without merit. However, Cole and Robles also claim the court should have instructed sua sponte on the validity of a good faith belief defense. On this last claim, we disagree as to Carlmont Capital and Alpha Telcom, but agree with respect to those counts involving the Pathway entities, Faith Holdings and Investment Revolution Strategies.

### a) *Required mental state*

The court instructed the jury the "necessary mental state" for section 25210 was " 'willfully.' " In setting forth the elements of the crime, the court informed the jury that the prosecution must establish that the defendant's "conduct (selling a security) was willful." Cole and Robles argue the court should have informed the jury that the required mental state for a licensing violation was "knowingly" rather than "willfully." They are mistaken. As we have explained, section 25210 is a general intent crime, which requires the defendant to intentionally do the illegal act. No further mental state beyond the willing commission of selling securities without a broker-dealer license is

required. Contrary to Cole and Robles's argument, knowing one needs a broker-dealer license is not an element of the crime. The court properly instructed on the mental state required for a criminal violation of section 25210.

### b)  *Mistake of law*

█   Cole and Robles also assert that the court erred by instructing the jury that a mistake of law is not a defense and this instruction removed their valid defense of a good faith belief that they did not need broker-dealer licenses. The argument lacks merit. Generally, mistake of law is not a defense to a crime. (See 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Defenses, § 37, pp. 368–369.) "If the act itself is punishable when knowingly done, it is immaterial that the defendant thought it was lawful." (*Id.*, § 36, p. 367.) Criminal intent in a general intent crime "is merely the intent to commit the prohibited act, not the intent to violate the law." (*Ibid.*) For example, in *People v. Young* (2001) 92 Cal.App.4th 229, 235, 237 [111 Cal.Rptr.2d 726], the Court of Appeal held the defendant's belief that the marijuana he was carrying was medicine under the Compassionate Use Act of 1996 (Health & Saf. Code, § 11362.5) and therefore he was acting legally was a mistake of law, which was not a defense to the general intent crime of transporting marijuana. " ' "It is an emphatic postulate of both civil and penal law that ignorance of a law is no excuse for a violation thereof. Of course it is based on a fiction, because no man can know all the law, but it is a maxim which the law itself does not permit anyone to gainsay." ' " (92 Cal.App.4th at p. 234.)

Mistake of law can be a valid defense when the crime requires specific intent if the mistake of law negates the specific intent of the crime. (1 Witkin & Epstein, Cal. Criminal Law, *supra*, Defenses, § 37, p. 369.) But because section 25210 is a general intent crime—not a specific intent crime—mistake of law is not a defense to the crime. The court did not err by instructing the jury that mistake of law is not a defense.

### c)  *Good faith defense*

█   Cole, joined by Robles, also argues that the trial court had a sua sponte obligation to instruct the jury that a good faith belief that they were not required to obtain a broker-dealer license was a valid defense to criminal violations of section 25210. For the reasons stated, we agree this is an affirmative defense, and the court must instruct sua sponte on applicable defenses if not inconsistent with the defense theory of the case. (See *People v. Montoya* (1994) 7 Cal.4th 1027, 1047 [31 Cal.Rptr.2d 127, 874 P.2d 903].) However, because this is an affirmative defense, Cole and Robles bore the

initial burden of producing evidence that supported a reasonable doubt whether they had such a good faith belief. (See *Salas, supra,* 37 Cal.4th at pp. 981–982.) In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defendant's evidence, but only whether " 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.' " (*Id.* at p. 982.) The threshold is not high; it does not include a predetermination by the court of the credibility of witnesses and what evidence it believes or disbelieves. (*People v. Tufunga* (1999) 21 Cal.4th 935, 944 [90 Cal.Rptr.2d 143, 987 P.2d 168].) " ' "Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused. [Citations.]" [Citation.]' " (*Ibid.*)

Our review of the record shows Cole and Robles did not meet this burden with respect to the direct investments they sold in Carlmont Capital and/or Alpha Telcom. However, Cole met his burden with respect to the investments he sold in the Pathway entities, Faith Holdings and Investment Revolution Strategies, and Robles met his burden with respect to the investments he sold in Pathway Securities.

After receiving DOC letters of inquiry concerning Carlmont Capital, Cole and Robles changed their approach and sold promissory notes issued by their own corporation, Pathway Strategies. At trial, Cole's expert testified that a director/officer of a corporation issuing its own securities (as was the case with Pathway, Faith Holdings and Investment Revolution Strategies) was not required to have a broker-dealer's license. The prosecutor's expert disagreed. This conflict, coupled with evidence showing that when Carol Peterson asked Cole and Robles if they were required to be licensed, they told her no license was required, and Cole gave Elizabeth Petersen the same response, was sufficient to raise a reasonable doubt whether Cole and Robles had a good faith belief that they were not required to be licensed. The Attorney General totally discounts the statements to Peterson and Petersen as mere misrepresentations made to consummate the transactions with these two investors. Although this is one reasonable interpretation, it is not the only one. We find these statements, in conjunction with the defense expert's testimony and the change in business strategy, enough to require an instruction.

Under these circumstances, it was error not to instruct on the affirmative good faith belief defense with respect to Cole's and Robles's section 25210 counts solely involving the Pathway entities, Faith Holdings and Investment Revolution Strategies.

The question remains whether the error was prejudicial. We conclude it was because it was reasonably probable that an outcome more favorable to

Cole and Robles might have been reached had the jury been instructed on the good faith belief defense with respect to their convictions of the section 25210 counts that involved investments in the Pathway entities, Faith Holdings, or Investment Revolution Strategies. (*People v. Watson* (1956) 46 Cal.2d 818, 836–837 [299 P.2d 243]; see also *Simon, supra,* 9 Cal.4th at p. 506 & fn. 11.) The jury was not told that a defendant's good faith belief that he or she is not required to be licensed as a broker-dealer is a valid defense to criminal violations of section 25210. As far as it knew, there were no valid affirmative defenses and the prosecution was entitled to a verdict in its favor if the elements of the crime were proven beyond a reasonable doubt. It should have been up to the jury, as trier of fact, to determine whether Cole and Robles were exercising a good faith belief that they did not need to be licensed as broker-dealers in selling securities that were issued by their own corporations. Here, two properly qualified experts disagreed on this issue, but the jury did not know it could consider this conflict as evidence supporting defendants' affirmative defense. As an appellate court, it is not within our purview to determine this factual issue. Having met their initial burden of proof to justify a good faith belief instruction with respect to those counts, the failure to instruct on this affirmative defense must be deemed prejudicial with respect to Cole's section 25210 convictions of counts that involved the Pathway entities, Faith Holdings, or Investment Revolution Strategies and Robles's section 25210 convictions of counts that involved the Pathway entities. Accordingly, the error necessitates reversal of the judgment entered on 11 of Cole's section 25210 counts and eight of Robles's section 25210 counts.[28]

### VI.–VIII.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

As to Cole, the judgment of conviction on counts 7 (Goins) and 22 for (Maroun) for selling securities by means of false statements or omissions in violation of section 25401 is reversed. As to Robles, the judgment of

---

[28] With respect to Cole we are reversing the judgment entered on the following: count 2 (DaSilveiras); count 6 (Flory); count 16 (Leginus); count 21 (Lovins); count 27 (Nichols); count 31 (Petersen); count 35 (Quintero); count 42 (Correia); count 46 (Roemmiches); count 49 (Petersons) and count 53 (Labruzzi). With respect to Robles, we are reversing the following: count 16 (Leginus); count 21 (Lovins); count 27 (Nichols); count 35 (Quintero); count 42 (Correia); count 46 (Roemmiches); count 49 (Petersons); and count 53 (Labruzzi).

The convictions for the section 25210 counts involving only direct investments in Carlmont Capital and/or Alpha Telcom stand.

*See footnote, *ante,* page 452.

conviction on count 22 (Maroun) for selling securities by means of false statements or omissions in violation of section 25401 is reversed.

The judgments of conviction for 11 of Cole's counts and eight of Robles's counts of selling a security without a broker-dealer's license in violation of section 25210 as outlined in footnote 29, *ante,* are reversed. The case is remanded for a new trial on these counts only, and for resentencing.

In all other respects, the judgments are affirmed.

Huffman, Acting P. J., and Nares, J., concurred.

Appellants' petition for review by the Supreme Court was denied January 23, 2008, S158600. Kennard, J., was of the opinion that the petition should be granted.